In re Willmann, a Minor.

(No. C-860023—Decided February 26, 1986.)

*Richard H. Finan* and *H. Fred Hoefle,* for appellants Douglas and Lori Willmann.

*Dinsmore & Shohl, Frank C. Woodside III* and *Deborah R. Lydon,* for appellee Children's Hospital Medical Center.

*Barbara H. Kuller,* guardian ad litem, for David Willmann.

Shannon, P.J. This cause came on to be heard, in harmony with App. R. 7(C) as an appeal having precedence over all other cases in this court, upon the notice of appeal, the transcript of the docket and journal entries, the original papers from the Juvenile Division of the Hamilton County Court of Common Pleas, the transcript of the proceedings, both adjudicatory and dispositional, and the briefs and oral arguments of counsel and the guardian ad litem.

The appeal derives from the order of the juvenile court finding one David Willmann, a seven-year-old male, to be a dependent child as defined by R.C. 2151.04(C), *viz.,* a child whose condition or environment is such as to warrant the state, in the interest of the child, in assuming his guardianship, and placing him in the temporary custody of the Children's Hospital Medical Center for the medical care that that institution

deems necessary, including, but not being limited to, "chemotherapy and/or surgery."

The singular assignment of error advanced is:

"The trial court erred to the prejudice of appellants' constitutional rights in adjudicating David Willmann a dependent child, in committing David to the custody of the Children's Hospital Medical Center ["CHMC"] and in authorizing whatever medical treatment for David is deemed necessary by CHMC, including chemotherapy and/or surgery, in that the judgment of the trial court was based on insufficient evidence and was contrary to the manifest weight of the evidence as it was not supported by the clear and convincing evidence required by the Constitution and the Revised Code."

The appellants, Douglas and Lori Willmann, the natural father and mother of David, buttress their assignment of error with four arguments setting forth contentions rooted in case law, statutes, and guarantees afforded by the Constitution of the United States.

These propositions are:

"(1) All parents enjoy a substantive constitutional right to make decisions concerning marital and family matters, to raise and care for their children and to make decisions pertaining to their care and welfare according to the dictates of their own consciences and free from intrusion by the state.

"(2) The right of family privacy and parental autonomy is not without its limitations, and the state is constitutionally authorized to intervene when parents, for whatever reason, fail to provide reasonably necessary medical care for their children.

"(3) The fact of dependency must be established by clear and convincing evidence, and, where based upon the failure of the child's parents to permit a specific medical procedure alleged to be in the best interests of the child [under R.C. 2151.04(A)] or upon the allegation that the environment or condition of the child is alleged to be such as to require immediate radical medical treatment [under R.C. 2151.04(C)] such medical procedure must be shown by clear and convincing proof to be reasonably necessary to the health and safety of the child; and that determination, in turn, must be based upon clear and convincing evidence, to a reasonable medical certainty: (1) that the benefit of the proposed treatment outweighs the risk of such treatment; (2) that the child's life is imminently threatened if some treatment is not undertaken; (3) that the proposed treatment is the most beneficial course available; (4) that the quality of the child's life will be improved, or at least not measurably impaired by such treatment.

"(4) Courts may not constitutionally interfere with the decision of parents not to consent to chemotherapy and forequadrant surgery consisting of the amputation of the left arm and shoulder of a seven year old boy with osteogenic sarcoma where (1) there is no evidence to a reasonable medical certainty that such a regimen can preserve the life of the patient; (2) the surgery is particularly mutilating and debilitating; (3) that even with such surgery and chemotherapy it is more likely than not — or at least as likely as not — that the disease is fatal; (4) that the chemotherapy will carry with it dozens of different, debilitating side effects, and is potentially fatal itself; (5) the parents base their decision on the adverse effects of the surgery and chemotherapy upon (a) the quality of what will remain of their son's life, with and without the surgery and chemotherapy; (b) the desire to avoid the gross mutilation of the body of their seven year old son; (c) the fact that the odds on survival even under the recommended regimen are poor; and (d) upon the result of their faith in God and the Bible that their son is, or will be, cured of his affliction."

Early in October 1985, David Will-

mann, then living in Hamilton County, Ohio, with his mother and father, Lori and Douglas Willmann, and his sister and brother, was brought by his parents to the Children's Hospital Medical Center (the "Center") in Cincinnati for examination. For several weeks prior to that date, David had been suffering from pain and swelling in his upper left arm. The examining physicians determined that David had a particularly malignant and aggressive form of cancer, osteogenic sarcoma.

The tumor was of such nature that the physicians and surgeons at the Center were convinced that David's only chance for survival depended upon removal of the tumor, a procedure which might require amputation of his left arm and a part of the shoulder girdle. Accordingly, it was recommended that chemotherapy be administered to David to diminish the tumor's size and to make the anticipated surgery possible.

This course of treatment was discussed with David's parents and, on October 10, 1985, Douglas Willmann signed a consent form that permitted the proposed regimen to commence. David underwent chemotherapy for some five or six weeks thereafter, and the attendant monitoring of the tumor revealed, early in December, that its mass had decreased by about twenty percent. Moreover, examination revealed no spread of the malignancy to David's lungs, the most likely area to which it would advance, or to the bone of David's arm. Resultantly, the physicians and surgeons, along with the members of the Tumor Board at the Center, reached the conclusion that the tumor could be removed by surgery, and that such procedure should take place virtually immediately.

In the interim in which David had been treated with chemotherapy, his parents had sought and received an opinion by a prominent expert in the field, one Dr. Norman Jaffe, in Houston, Texas. Dr. Jaffe concurred with the plans of treatment recommended by the Center and estimated that David would have a sixty percent chance of survival with the proposed medical intervention.

On December 13, the two members of the Center's staff who had been intimately involved in David's case from the time of the original examination, Dr. Ralph Gruppo, a board-certified specialist in pediatric hematology-oncology, and Dr. Alvin H. Crawford, a pediatric orthopedic surgeon, conferred with Douglas Willmann to explain, in detail, the recommended operation. Douglas Willmann stated to them that neither he nor his wife would consent to the surgery, partly because their religious faith taught them that David had been "healed."

Although no effort was made to change Douglas Willmann's religious beliefs, Dr. Gruppo told him that the need for surgery was absolute, and that to withhold it would be to sentence David to death. Dr. Gruppo also advised Douglas Willmann that the optimum time for the surgery was the following week, and that if they, the parents, refused their consent, the Center would have the obligation to bring the matter to the attention of the appropriate authorities. Douglas and Lori did not relent and, on December 16, 1985, attorneys for the Center filed a complaint in the Juvenile Division of the Hamilton County Court of Common Pleas, alleging, *inter alia,* that David then appeared to be a dependent child in that his condition and environment warranted the state, in his best interests, in assuming his guardianship. Barbara H. Kuller, attorney at law, has appeared in all phases of the consequent proceedings as the guardian ad litem for David and has, we note, consistently maintained a position in complete agreement with the arguments advanced on behalf of the Center.

Notwithstanding the Center's decision to seek relief in juvenile court, Douglas, Lori and David Willmann left Hamilton County. When they returned

on December 30, 1985, David was taken by his parents to the Center, where he was re-evaluated by Dr. Gruppo. At that time, David was experiencing discomfort in his left arm and numbness in his left hand and fingers. The swelling in his arm was found to have increased markedly. These symptoms prompted Dr. Gruppo to request, again, that the parents consent to surgery. Once more, Douglas Willmann refused to permit surgeons to operate upon his son, but did agree to allow the reinstitution of chemotherapy. However, on the next day, December 31, Douglas advised Dr. Gruppo that he and his wife would not permit even chemotherapy.

David remained, nevertheless, under evaluation at the Center during the period from January 7 to January 9, 1986, and it was determined that the malignancy had increased in size and had invaded David's shoulder joint. These events led Dr. Gruppo to reach the following conclusions, which were expressed in his testimony to the court on January 10, 1986:

"A.  The only chance of survival would be complete removal of the tumor in order to offer David any chance of survival. We would recommend chemotherapy. After a period of chemotherapy, re-evaluation and at such time that the orthopedic surgeon felt that the tumor could be completely resected would be [sic] to promptly do so and to follow that with continued chemotherapy for a period of six months to a year.

"Q.  Okay, Doctor, when you give your recommendation as far as chemotherapy and surgery following that, is it your opinion that's David's only chance for survival?

"A.  Yes, it is.

"Q.  Do you believe that David is currently in a life-threatening situation?

"A.  Yes.

"Q.  And do you have any opinions as to what David's condition may be in the future — strike that. Can you state what David's condition, in your opinion, would be in the future if he doesn't undergo this course of chemotherapy followed by surgery?

"A.  If he does not undergo surgery and chemotherapy, two things will happen. The tumor will continue to grow locally, and there are several possibilities. He may fracture the bone of the humerus causing pain. It may break through the skin becoming secondarily infected and disagreeable in terms of odor and care.

"And, then, in addition, the metastases, the spread of the tumor elsewhere is very, very likely to appear causing most commonly respiratory obstruction and eventually the most common cause of death would be essentially from impairment of breathing.

"Q.  Do you have a prognosis as to how long David might anticipate he could be able to survive without any initial treatment whatsoever?

"A.  This would be very liberal, one year. With an aggressive tumor that he has, considerably less."

Dr. Crawford's testimony to the court reiterates Dr. Gruppo's observations. On direct examination he made these statements:

"Q.  And as I understand it, that the only chance for survival that he has is chemotherapy followed by re-evaluation, and, then, the possibility of surgical procedure?

"A.  I would say that infinitely [sic]. His chance[s] of survival being what they are, the only assurance of survival to a degree of significance would be that he undergo chemotherapy to diminish or control as much as the tumor macroscopically followed by resection of the bulk tumor.

"Q.  That's really the only chance he has?

"A.  That's the only chance."

On cross-examination, Dr. Crawford said:

"Q.  Is it fair to characterize the

situation for David that if he does have the chemotherapy ordered by the Court, if he has surgery ordered by the Court, at the best he's going to have an uphill fight?

"A. Relative to longevity he's going to have an uphill fight. Without it he doesn't have a fight at all."

Both Douglas and Lori Willmann testified before the court in the course of the adjudicatory and dispositional hearings. The court and, indeed, all those connected with this matter, were completely circumspect in referring to and in considering the religious convictions expressed by the Willmanns, who are, obviously, devoted parents fully committed to their Christian faith.

Their responses to the opinions and recommendations of the personnel attached to the Center, and their personal advisor, Dr. Jaffe, as well, consist essentially of declarations that no need for chemotherapy or surgery exists at all because David has already been healed or cured.

At one point, Douglas Willmann declared:

"A. And what that led us to believe through, again, through the whole [B]ible is that, in fact, David had been healed already based on what Christ had done on the cross 2,000 years ago and that was — that was the only reason that we changed — or that was the only reason I changed my decision at that time.

"Q. Let me make sure I understand. You read something at that time that led you to believe he did not need a future course of treatment?

"A. That's correct.

"Q. Are you saying that had you read that sooner, perhaps even before you ever brought him to Children's Hospital Medical Center, you would never have brought him to Children's Hospital Medical Center?

"A. I don't think I would go that far. I would say that if I had come to

that determination earlier in the course of therapy that yes, we — I would have changed my mind sooner; that there is still reasons to have doctors and hospitals and everything; that it's sort of a fine line. I definitely would have taken him down at least to be diagnosed to see what was the matter with our son."

Subsequently, he said:

"Q. Yes. I'm wondering whether you're saying that the [B]ible leads you to believe that treatment of any nature is not necessary for your son regardless of what his condition is?

"A. I would say that at this point in time, in David's particular circumstances, that is correct because we believe that he is, in fact, healed right now and I don't think that you would give a well person medicine. So my answer would be yes."

Douglas Willmann was examined by counsel for the Center with respect to his attitude toward possible medical treatment for his other children as affected by his religious beliefs, and with respect to his prognosis for David. In response, he said:

"Q. Okay, when I use the word 'treatment,' I mean a procedure or a medication or something instituted to correct a medical problem. Are you saying that you would agree to medical treatment, for example, in the form of surgery for your other two children in the future?

"A. I'd have to base that on the circumstances of that particular situation at that time.

"Q. Do you believe that David is going to live a normal period of life?

"A. Yes, I do.

"Q. Do you believe that he will grow up and live, for example, until approximately seventy-five years of age in his current state?

"A. Yes, I do.

"Q. What do you base that opinion upon?

"A. The fact that he is healed and

that based on that, the arm is going to return to normal at some point, and —

"Q. Have you received any other medical opinions that have been presented to you that David is healed, and when I say 'other medical opinions,' I'm wondering if you received medical opinions other than those at the Children's Hospital Medical Center that have led you to believe your son is healed?

"A. No, they have not, no.

"Q. Have you received any opinions from persons other than medical doctors leading you to believe that your son is healed?

"A. Not other than the [B]ible itself.

"Q. There have been no other individuals other than you and your wife who have discussed this matter with you and led you to believe your son is healed?

"A. There are other people who have the same beliefs about healing in the [B]ible, but nobody has — that's as close as I can come."

Lori Willmann expressed her basis for the persistent refusal to consent to surgery being performed upon her son in several ways. She said at one point, for example:

"Q. And what were your feelings at that time [early October 1985]?

"A. I was feeling the same way. I was hoping it [David's need for surgery] wouldn't have to get to that point. Through my faith I believe that I would be prepared to make a decision at the time that a decision was to be made and when that time came, as far as I was concerned, there was no decision to make when I looked at the alternatives.

"Q. What are the alternatives?

"A. Well, what we're talking about is not just amputation. We're talking gross mutilation of a body of a seven year old boy.

"And not only that but with the chemotherapy effects that go with that and anyone in this courtroom, I wonder if they've actually sat and watched from the emotion standpoint of what that really entails. If they would go up on 4-West and sit with the parents and sit with the loved ones of those blessed little children in there suffering through the chemotherapy day in and day out, and, then, you would ask yourself for what? For a 50 percent chance maybe?

"Q. Better than no chance at all, isn't it?

"A. We're saying he does have a chance.

"Q. Medically there is no indication that he has a chance that you know of, is there?

"A. Medically there isn't."

In the same tenor, we find these expressions in the record:

"Q. Okay, in light of your belief that David is healed, I'm rather surprised by your willingness to cooperate in the diagnostic studies. Could you explain that a little bit to me?

"A. You mean the diagnostic study that we signed?

"Q. The CAT scan and the bone scan.

"A. We wanted to monitor it. We wanted to be able to see what is going on.

"Q. But you are still nonetheless convinced the healing has happened?

"A. The healing happened 2,000 years ago. The symptoms are still there. The healing — that price was paid for the healing happened 2,000 years ago. The symptoms are still there, and we do want to monitor those. We're saying that we have received the fact that we believe David will be healed."

At the conclusion of all the evidence, and after hearing arguments from the guardian ad litem and from counsel for the Center and the parents, the court found David to be a dependent child as defined in R.C. 2151.04(C). Immediately, it was stipulated by all parties that the testimony and evidence received in the adjudicatory proceeding be incor-

porated and considered in the dispositional hearing.

On January 11, 1986, the court spread upon its journal the following finding and order:

"I find [R.C.] 2151.353(A)(3) applicable. Wherefore, it is Ordered that David Willmann be placed in the temporary custody of Children's Hospital Medical Center on 1/12/86 for the medical care and treatment that said Medical Center deems necessary including but not limited to chemotherapy and/or surgery. Child not to be removed from Hamilton County, Ohio without permission of this Court; Mrs. Barbara Kuller to continue as *Guardian Ad Litem*. Said minor to be delivered to the hospital as an inpatient by the parents 1/12/86."

The notice of appeal was filed forthwith, and on January 13, 1986, the appellants filed in this court a motion to stay the order of the juvenile court in all particulars. This court conducted a hearing on that motion and, on January 14, 1986, issued an order granting a partial stay in these terms:

"It is therefore Ordered, Adjudged and Decreed that the said Children's Hospital Medical Center, as the temporary custodian of the said David Willmann, administer medical care and treatment with respect to the administration of chemotherapy to the said David Willmann as ordered by the said Juvenile Division until further order of this Court."

Since that time, we have been advised by counsel for the parties that David has received chemotherapy treatments and been evaluated at the Medical Center on an outpatient basis only. He has otherwise been permitted to live with his parents at their home.

The general response by the Center, adopted wholly by the guardian ad litem, is that, based upon the record, it must be said that the juvenile court properly found David Willmann to be a dependent child and properly ordered the treatment of him that his parents refused to permit. Their particularized response is that the constitutional issues broached by the assignment of error and its quartet of postulates were not raised below and, accordingly, cannot be raised on appeal. *State, ex rel. Specht,* v. *Bd. of Edn.* (1981), 66 Ohio St. 2d 178, 182 [20 O.O.3d 191], citing App. R. 12(A).

Without intent to denigrate the salutary rule that a reviewing court need not consider questions, even constitutional in nature, that were not raised in a trial court, *State* v. *Awan* (1986), 22 Ohio St. 3d 120, syllabus, we have elected to address the claims advanced by the Willmanns in the case *sub judice* because of the compelling facts involved.

In analyzing and resolving the issues posed, it is as important to determine what this case does not involve as it is to decide what it does. Clearly, we are not confronted by a case wherein the administration of medical care and treatment is resisted because that care is forbidden by scripture as interpreted by those who seek to have it barred. Nowhere in the record does it appear, directly or by reasonable inference, that David's parents maintain that the Center should not be permitted to provide the child with the medical care, including chemotherapy and surgery, that it deems to be necessary because such ministrations contravene scriptural laws, rules, edicts or, *per se,* their religious beliefs. What Douglas and Lori Willmann stoutly profess is that they believe by their interpretation of the Bible that David has already been healed by divine intervention and that no treatment by mortal hands need be afforded. For them, the healing is complete because it was accomplished two millennia ago.

There are certain principles and precepts designed to protect our basic freedoms that are so deeply embedded

in our jurisprudence that any question of their validity and persuasive power has been removed. Some of those protections were restated in *Prince* v. *Massachusetts* (1944), 321 U.S. 158, and have been reiterated, in substantial part, in *Birch* v. *Birch* (1984), 11 Ohio St. 3d 85, 87. We note them here to provide the fundaments from which we have proceeded in formulating our responses to the assignment of error and its subordinates.

We take it as given that:

"* * * [T]he custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder. * * *

"* * * [N]either rights of religion nor rights of parenthood are beyond limitation. * * *" *Prince* v. *Massachusetts, supra,* at 166.

"* * * [T]he family itself is not beyond regulation in the public interest, as against a claim of religious liberty. * * *" *Id.*

"* * * [T]he state has a wide range of power for limiting parental freedom and authority in things affecting the child's welfare * * * [and such power] includes, to some extent, matters of conscience and religious conviction." *Id.* at 167.

"The state's authority over children's activities is broader than over like actions of adults. * * *" *Id.* at 168.

"* * * [The authority of the state as *parens patriae*] is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion or conscience. * * *" *Id.* at 166.

"* * * A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens, with all that implies * * * [and the state] may secure this against impeding restraints and dangers within a broad range of selection. * * *" *Id.* at 168.

"* * * The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death. * * *" *Id.* at 166-167.

The contesting parties to this litigation are polarized; their positions cannot be reconciled because they are totally at odds. The single point at which they harmonize is that David's best interests must be served. The Center is convinced that only the regimen of chemotherapy and surgery can save David's life. The Willmanns are positive, on the other hand, that David is a well person who needs no treatment.

The juvenile court has chosen to adopt the convictions expressed by the physicians and surgeons. The responsibility of this court is to determine whether the juvenile court had before it evidence sufficient to convince a reasonable mind, clearly, certainly and convincingly, that David was a dependent child as defined in R.C. 2151.04(C), and whether the dispositional order of the juvenile court is supported by a preponderance of the evidence. R.C. 2151.35; Juv. R. 29(E)(4).

We have tested the record submitted by the appellants by the postulates enumerated, *supra,* and can find no basis upon which to declare that the juvenile court misread the evidence adduced or stipulated, in either the adjudicatory or the dispositional phase of the properly bifurcated proceedings. Neither can it be said from our independent examination of the legal issues posed that the court below misconstrued or misapplied the law germane to the case.

The evidence that David was, at the time the hearings were conducted and concluded, afflicted with osteogenic sarcoma at a site in his upper left arm and, possibly, in his left shoulder area, stands unchallenged from a medical standpoint. All — every one — of the physicians and surgeons, including the eminent authority to whom Douglas and Lori Willmann referred David, agree on the nature and

location of the malignancy that has invaded his body. The juvenile court had the duty to evaluate the credibility of the testimony and opinions expressed by those witnesses, and the attendant right to believe them in whole or in part. The decision of the court to adopt the conclusions of the experts cannot be faulted. Its determination of dependency is justified completely by the evidence, the credibility of which is beyond assault.

Under such circumstances, the court had no alternative but to exercise the authority of the state under the doctrine of *parens patriae* to protect David's welfare and, indeed, to act to save his life. Such intervention regulated or limited the primary right of Douglas and Lori Willmann to control David's care and nurture, but the authority of the parents must yield to that of the state, upon the undeniable facts, because the faith of the parents, as firm and clear as it is, does not permit them, under the law of this state and the nation, to expose David to progressive ill health and death.

The delegation of the technical custody of David to the Center must be said to have followed, naturally, if David was, and is, to be provided with what from the record is the only possible course of treatment to save his life. Granting that Douglas and Lori Willmann have the unquestionable right to enjoy complete religious liberty, the court has the right, in law, to order the treatment prescribed for David because the court stands *in loco parentis* and possesses the authority to preserve David's well-being and best interests.

The state's authority over children's activities must, as we have already noted, be broader than it is over like activities of adults if those of tender years are to be protected against some clear and present danger. Adults are ordinarily free to make choices denied to those of less than full age, but when those choices threaten the welfare of a child, the state must intervene.

Douglas and Lori Willmann may, under the Constitution of the United States and the Constitution of the state of Ohio, be free to deny themselves whatever medical care they choose, but it does not, and cannot here, follow that they are free to impose that denial upon David.

We hold it to be self-evident that parents may be free to become martyrs themselves, but that they are not free, under identical circumstances, to make martyrs of their children before they have reached the age of full and legal discretion when they can make that choice for themselves. *Prince* v. *Massachusetts, supra,* at 170; *Birch* v. *Birch, supra,* at 87.

For the reasons given, the assignment of error, as illuminated by its subordinate postulations, is not well-taken and is overruled.

The judgment of the Court of Common Pleas of Hamilton County, Juvenile Division, is affirmed, and the order of this court staying, in part, the order of that court decreeing that David Willmann, the child found to be a dependent child, be afforded the medical care and treatment deemed to be necessary, including but not limited to chemotherapy and/or surgery, by his temporary custodian, the said Children's Hospital Medical Center, is resultantly dissolved and set aside.

*Judgment accordingly.*

KLUSMEIER and KEEFE, JJ., concur.

KEEFE, J., concurring. This matter has been for me an extremely difficult case mainly because of the troublesomely conflicting authorities between loving parents on the one hand, and the juvenile court on the other. Naturally, and ordinarily, David's parents should have the right to choose the medical treatment they consider best for him. Because of the parents' difficulty in con-

ceding the life-threatening nature of David's illness, the power of the juvenile court has been invoked to protect the boy's right to live.

I believe the court below has decided correctly that David's condition warrants the state — in David's interest — to assume his guardianship. R.C. 2151.04(C). However, the concomitant dispositional order of the juvenile court committing David to the temporary custody of the Children's Hospital Medical Center ("Center") causes me great consternation principally because the order has no termination date. In other words, the boy is turned over to the custodial institution for an indefinite period which could endure until he reaches age eighteen. Potentially this removes David's parents from any participation in the boy's medical treatment for much too long a period. The court's order would be more responsive to the instant problem were it to limit the temporary custody of the Center to six months, nine months or so, following which the juvenile court could reexamine the boy's overall condition at a hearing involving the parents.

Moreover, the court's disposition of David is under the authority of R.C. 2151.353(A)(3). In my view the disposition would have been more providently accomplished pursuant to R.C. 2151.353(A)(1) which permits the parents greater authority over the boy and his medical treatment than is the case under R.C. 2151.353(A)(3).[1] Use of R.C. 2151.353(A)(1) as the basis for disposition would also have the advantage of retaining in the juvenile court more ongoing authority than would seem to be the case under R.C. 2151.353(A)(3).

Notwithstanding my expressed reservations, I choose to affirm the judgment below because the custodial status of David is in fact "temporary," and at any time after our order of affirmance is entered — even the next day, for example, if desired — the parents have the ab-solute legal right to go anew to juvenile court seeking termination of the "temporary" custody in the Center. The Center's custody of David is continually reviewable, over and over again, by the juvenile court.

In concurring, I do it with a prayer that the intense faith of David's parents, together with the sound and composed judgment and recognized skill of the professionals of the Center, may bring the boy's current health predicament to a salutary result of unlimited duration.

---

[1] R.C. 2151.353, disposition of abused, neglected or dependent child, reads, in part:

"(A) If the child is adjudged an abused, neglected, or dependent child, the court may make any of the following orders of disposition:

"(1) Permit the child to remain with his parents, guardian, or other custodian, subject to such conditions and limitations as the court prescribes, including supervision as directed by the court for the protection of the child;

"* * *

"(3) Commit the child to the temporary custody of any institution or agency in this state or another state authorized and qualified to provide the care, treatment, or placement that the child requires; * * *."