2001 OK CIV APP 21

**In the Matter of D.R., an alleged deprived child.**

**State of Oklahoma, Appellee,**

v.

**Jason Rogers and Leeann Rogers, Appellants.**

No. 94,659.

Court of Civil Appeals of Oklahoma, Division No. 4.

Jan. 16, 2001.

As Modified Feb. 26, 2001.

Lynn R. Anderson, Assistant District Attorney, Sallisaw, OK, for Appellee.

John P. Sopher, Robert A. Ridle, Oklahoma City, OK, for Appellants.

*OPINION*

STUBBLEFIELD, J.

¶ 1 This is an appeal by natural parents from the district court judgment decreeing their minor child to be a deprived child. Based on review of the record on appeal and applicable law, we affirm.

¶ 2 Appellants, Jason Rogers and Leanne [1] Rogers (Parents), are the parents of an infant daughter, D.R., who at the time of hearing, was seventeen months old. In her short life, D.R. has suffered from frequent seizure activity, along with developmental difficulties, including small size, poor motor skills, and visual and hearing impairment. Because of their religious beliefs, Parents did not voluntarily seek medical evaluation or treatment for D.R.'s seizures.

¶ 3 When D.R. was approximately ten months old, the Department of Human Services (DHS) was informed of D.R.'s problems, and officials of that agency contacted Parents regarding the child's care. Shortly thereafter, Parents, at the urging of the paternal grandparents, sought a medical evaluation of D.R. After this evaluation, Parents did obtain physical therapy for D.R. three times a week, which seemed to benefit the child.

¶ 4 On February 21, 2000, while at the therapy clinic, D.R. experienced a severe seizure which lasted about ten minutes, during which time she stopped breathing for 60 seconds. Despite the serious nature of this seizure, Parents refused any further medical evaluation or treatment of D.R., and discontinued the physical therapy.

¶ 5 After Parents made it known that they would no longer take D.R. for physical therapy or seek any treatment for D.R.'s seizures, DHS filed an application with the district court seeking temporary emergency custody of the child. The application was granted, and DHS then placed D.R. in the home of her paternal grandparents, who agreed to cooperate with treatment for the child.

¶ 6 The State filed a petition seeking adjudication of D.R. as a deprived child, based on the principle allegation of medical neglect by Parents. The petition was heard on April 3, 2000. The evidence at trial demonstrated that D.R. had a severe medical condition which was potentially life-threatening. However, Parents stated their intent to refuse any further treatment of D.R. because of their religious beliefs. They are members of The Church of Truth, which teaches its members to reject medical treatment of all illness in favor of spiritual healing. Parents testified that they believe the teachings of their church and refuse all medical treatment for themselves as well as their child. The parties stipulated that The Church of Truth is a recognized church.

¶ 7 The trial court adjudged D.R. a deprived child and awarded custody to DHS. From this adjudication, Parents appeal.

¶ 8 Parents have briefed two issues on appeal:[2] (1) the trial court improperly based its decision on Parents' religious beliefs, and (2) the trial court erred when it overruled Parents' demurrer to the evidence.

¶ 9 Court supervision over custody and welfare of children is equitable in nature, and the findings and judgment of the trial court will not be set aside unless clearly against the weight of the evidence. *In re C.O.*, 1993 OK CIV APP 64, ¶ 19, 856 P.2d 290, 296. Where the trial court is sitting without a jury, its findings are entitled to the same weight that would be given a verdict by a jury. *In re J.M.*, 1978 OK CIV APP 121, ¶¶ 4, 5, 858 P.2d 118, 120–21.

---

1. Leanne is the correct spelling of Mrs. Rogers' name, even though throughout the case, including the petition in error, the name has been spelled Leeann in the case caption.

2. Propositions of error which are not briefed are waived. *DLB Energy Corp. v. Oklahoma Corp. Comm'n.*, 1991 OK 5, ¶ 5 n. 6, 805 P.2d 657, 659 n. 6.

**168**

¶ 10 We shall first deal with Parents' second contention of error—that the trial court erred when it overruled Parents' demurrer to the evidence. A demurrer to the evidence should be overruled unless there is no competent evidence or reasonable inference from evidence tending to establish a cause of action. *Middlebrook v. Imler, Tenny & Kugler M.D.'s, Inc.*, 1985 OK 66, ¶ 44, 713 P.2d 572, 586. In this case, we find ample evidence which we shall hereinafter discuss in more detail, supporting the finding that D.R. is a deprived child. Therefore, we hold that Parents' demurrer to the evidence properly was overruled by the trial court.

¶ 11 Parents' foremost assertion is that the trial court erred when it based its finding that D.R. was deprived on Parents' religious beliefs. In support of this assertion, they rely entirely on a provision in 10 O.S. Supp.1998 § 7001–1.3(A)(14), which states:

> Nothing in the Oklahoma Children's Code shall be construed to mean a child is deprived for the sole reason the parent, legal guardian, or person having custody or control of a child, in good faith, selects and depends upon spiritual means alone through prayer, in accordance with the tenets and practice of a recognized church or religious denomination, for the treatment or cure of disease or remedial care of such child.

However, we do not find that the trial court made its ruling solely upon Parents' religious beliefs.

¶ 12 We construe the above-quoted language to mean that a child is not "deprived" merely because his/her parents address injury or illness by spiritual healing, *so long as the child is not then in need of special treatment for illness, injury or medical condition that may have serious debilitating consequences.* A complete reading of section 7001–1.3(A)(14), shows legislative intent that courts have authority to find a child such as D.R. deprived, notwithstanding Parents' religious beliefs, if there is a threat to a child's health or welfare. Section 7001–

1.3(A)(14) concludes with the following language:

> Nothing contained in this paragraph shall prevent a court from immediately assuming custody of a child and ordering whatever action may be necessary, including medical treatment, to protect the child's health or welfare.

In addition, 10 O.S. Supp.1998 § 7001–1.3(A)(14)(c), defines a deprived child as:

> [A] child in need of special care and treatment because of the child's physical or mental condition, and the child's parents, legal guardian, or other custodian is unable or willfully fails to provide such special care and treatment. . . .

¶ 13 Thus, the statutory requirements for deprived adjudication have little to do with parents' religious beliefs. There is legal authority for such an adjudication if (1) the child is in need of special medical care or treatment, and (2) the parents willfully fail to provide such care or treatment. The latter fact may be based on the parents' religion, but it is not the religion which necessitates the adjudication, but rather the fact of a child's need for medical care and treatment coupled with the parents' willful failure to provide it.

¶ 14 We find clear and conclusive evidence supporting the conclusion that both circumstances exist in this case: the child needed special treatment and Parents willfully failed to provide it. It is uncontroverted that D.R. suffers from epilepsy. Dr. Joseph P. McCarty, a neurologist of eighteen years, testified that he had examined D.R. and found her suffering from complex partial epilepsy,[3] which he described as a potentially life-threatening condition. D.R. was also underweight and very small for her age, could not crawl or walk, had decreased responsiveness to any sort of sound, had abnormal reflex on her right lower extremity, and suffered from decreased muscle tone. Dr. McCarty testified that D.R.'s electroencephalogram, which measures and records the electrical activity over the surface of the brain, was "a very grossly abnormal EEG," a "type of EEG [which would] typically be seen in a patient

---

**3.** The doctor defined complex partial epilepsy as complex partial seizures that occur on more than one occasion without any specific provocation or trigger.

with epilepsy that is not controlled." He testified about numerous "eleptiform discharges" in D.R.'s brain, and went on to state that the EEG results were in the worst one percent of tests he had ever read. After his examination, Dr. McCarty placed D.R. on Tegretol, an anti-epileptic medication used to prevent seizure activity, to be administered by mouth three times a day.

¶ 15 Dr. McCarty's lengthy and detailed testimony provided the trial court with an overview of the special and urgent treatment necessary for children with epilepsy. He also testified as to the long term prognosis for children diagnosed with complex partial epilepsy, with and without medical treatment, as well as the potential side effects of the medicine Tegretol. The following is an overview of Dr. McCarthy's testimony.

¶ 16 In children with epilepsy which is not brought under control with medication, the disease usually worsens over a number of years. If a child with severe epilepsy, such as D.R., is not treated, seizures often interfere with the child's learning and developmental progress, and can lead to further brain damage and possible death as the seizures increase in severity. Even if the untreated disorder does not directly result in death, child sufferers face a considerably increased risk of accidental death.

¶ 17 Once administration of Tegretol begins, as it had with D.R., it cannot be abruptly stopped, or the patient is at an increased risk of experiencing greater numbers of seizures than were experienced prior to taking the medication. The patient would also be at greater risk of experiencing "status epilepticus" a condition described by the Doctor as continuous seizure activity lasting more than thirty minutes, which can cause additional brain injury or death.

¶ 18 According to Dr. McCarthy's testimony, a child on Tegretol has a good chance of becoming seizure free. If the child has a good response to the medication, the medication usually can be withdrawn after two years, and three out of four children can remain off the medication and remain seizure free. In the one out of four children whose seizures do recur, a return to the medication for an additional period of time often ends seizure activity.

¶ 19 Side effects of Tegretol affect less than one-percent of those taking the medication and generally are minor. The most serious of these side effects is a bone marrow suppression which can be fatal. However, this occurs in less than one in fifty-thousand patients, and such side effects can be monitored with periodic blood tests, and prevented.

¶ 20 There is no question that Parents believe they are properly caring for D.R. by their spiritual approach to curing her affliction. However, as this court stated in *In re C.O.*, 1993 OK CIV APP 64, ¶ 23, 856 P.2d 290, 295, the fact that Parents believe their treatment of their child is not abusive or neglectful does not prevent the trial court from finding the child deprived. The state has an interest in protecting the lives of its children, which may override parental decisions which threaten a child's life. *See Prince v. Massachusetts*, 321 U.S. 158, 165–66, 64 S.Ct. 438, 88 L.Ed. 645 (1944).

¶ 21 It is also well settled that the state may order medical treatment for a non-life threatening condition, notwithstanding the objection of the parents on religious grounds, if the treatment will, in all likelihood, temporarily or permanently solve a substantial medical problem. *Prince* at 167–70, 64 S.Ct. 438 (although parents may be free to become martyrs themselves they may not make martyrs of their children, and "[t]he right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death"); *see also Wisconsin v. Yoder*, 406 U.S. 205, 230, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (even when parents' actions are in accord with religious convictions, they are not free from legislative restrictions where the actions pose some substantial threat to public safety, peace or order, or the health and welfare of a child); *In re Willmann*, 24 Ohio App.3d 191, 493 N.E.2d 1380 (1986) (religious faith of parents of a sick child, as firm and clear as their faith may be, does not permit the parents to expose the child to progressive ill health and death).

¶ 22 There are exceptions to the rule. For instance, courts have held that a state cannot order that a child receive medical treatment over religious objections of the parents when the treatment itself is very risky, extremely invasive, toxic with many side effects, and/or offers a low chance of success. *See People in Interest of D.L.E.*, 200 Colo. 244, 614 P.2d 873 (1980) (parents of twelve-year-old child who suffered epilepsy as a result of brain damage were not compelled to seek treatment where it was unknown if condition would progress to a life-threatening stage and treatment itself would, in all probability, cause dangerous side effects); *Newmark v. Williams*, 588 A.2d 1108 (Del.Supr.Ct.1991) (parents' refusal of cancer treatment of three-year-old child was upheld when treatment had only a forty-percent chance of cure, was highly invasive, painful, and involved serious temporary and permanent side effects). However, the evidence in this case conclusively establishes that none of these exceptional circumstances exist.

¶ 23 The evidence demonstrates that the examination to determine the extent of D.R.'s epilepsy was neither invasive nor painful, as evidenced by the fact that she slept through most of the procedure. The testing established that D.R.'s epilepsy is severe and potentially life-threatening. The prescribed treatment for D.R., Tegretol, has a low incidence of side effects which can be monitored by regular follow-up blood tests.[4] The drug is administered in a suspension, by mouth, which is neither invasive nor painful. Finally, the child was benefitting from the treatment. The testimony of the paternal grandmother indicated that the seizure activity had diminished, and that D.R. had begun to gain weight.

¶ 24 This child, unquestionably loved by her parents, suffers from a serious medical condition which threatens her health, and causes substantial developmental problems. She is in danger of suffering further brain damage or dying without medical treatment. Both Parents testified they understood that if the medication is discontinued, D.R.'s condition will, in all likelihood, worsen, and she may die. Despite this understanding, Par-

ents testified that they will stop the medication if D.R. is returned to their custody.

¶ 25 Based on this evidence, we find the trial court appropriately determined D.R. to be a deprived child, as defined in 10 O.S. Supp.1998 § 7001–1.3(A)(14)(c). We find no error in the trial court proceeding which would support reversal. Accordingly, the judgment must be affirmed.

¶ 26 AFFIRMED.

¶ 27 GOODMAN, C.J., Presiding, and REIF, J., concur.

---

4. At the time of trial, D.R. had suffered no side effects from the medication.