OPINION OF THE COURT
Herbert A. Posner, J.
Every now and then, a Judge is presented with a case that requires him to make a decision in which he is "damned if he does and damned if he doesn’t”.
THE ISSUE
Should the court, in its role as parens patriae, order unlimited blood transfusions for a minor, seven weeks short of 18? *725 The young man and his parents all vigorously oppose blood transfusions on First Amendment (religious freedom) grounds. They believe that the taking of someone else’s blood is a serious violation of God’s law and will prevent them from achieving everlasting life.
THE FACTS
Phillip Malcolm, who will be 18 years old on May 30, 1990, was admitted to Long Island Jewish Medical Center from the emergency room at about 7:00 p.m. on April 11, 1990. His blood count showed anemia with a hemoglobin of 6.4 grams against a normal of 13 to 16 grams, and his hematocrit was 19.2 against a normal of 39 to 48. Preliminary tests indicated that his blood was being broken down and that in all likelihood he would require a blood transfusion. However, Phillip and his parents are members of Jehovah’s Witnesses, a religious group whose tenets forbid blood transfusions[1] and they refused to consent to a transfusion if it became medically necessary.
The following morning, April 12th, the hospital petitioned this court for an order authorizing necessary medical treatment, including blood transfusions, for Phillip Malcolm. A hearing was held at the hospital that same afternoon. The treating physician, Dr. Ashok Shende, a board-certified pediatric hemotologist-oncologist, reported that at 7:00 a.m., the patient’s blood level was 6.3 grams as against 6.4 upon admission, and his hematocrit was 18.3 as against 19.2 upon admission. The doctor testified that CAT scans of the patient showed an extensive mass involving the back part of the abdomen with fluid on both sides of the chest and that a bone marrow analysis revealed there were malignant cells in the bone marrow. The results of a needle biopsy of the mass were not then available but the patient appeared to be suffering from a pediatric cancer of the tissue that is to become muscle. The recommended course of treatment would be chemotherapy and radiation and, in the doctor’s opinion, the survival factor, with treatment, was from 20 to 25%. However, the chemotherapy would further suppress the production of red blood cells and could not be undertaken without authorization for blood transfusions.
Phillip Malcolm was present at the hearing with his par *726 ents, Theodore and Joan Venable. Theodore Venable, the patient’s stepfather, testified that his religion prohibited blood transfusions and that he believed Phillip would die or be unable to live a normal life, regardless of what was done. He stated that he was unalterably opposed to Phillip receiving any blood transfusions. Joan Venable, Phillip’s natural mother, testified that her religious beliefs would not allow her to consent to blood transfusions for her son. Phillip also stated that he would not accept blood transfusions because, of the teachings of his religion.
The court, realizing that this was the first time the patient and his parents had heard that Phillip was suffering from widespread cancer, deemed it advisable to allow them time to reflect and to reconsider their decision regarding blood transfusions. Accordingly, the hearing was adjourned to the following day.
When the hearing resumed on April 13th, an attorney from the Jehovah’s Witnesses religious sect appeared on behalf of the respondent and his parents. Also present were three "elders” of the Jehovah’s Witnesses.
The first witness was Dr. Philip Lanzkowsky, chief of staff of pediatrics and chief of pediatric hemotology and oncology at Long Island Jewish Medical Center, who was supervising the treatment of Phillip Malcolm at the hospital. He stated that Phillip had disseminated malignant disease. There was a large mass infiltrating the abdominal cavity, with spread to the vertebrae and the area of the right buttock. The cancer had metastasized to the bone marrow and there was also pulmonary effusion in both lungs. Because of the dropping hemoglobin and low blood pressure, blood transfusions would have to be administered before chemotherapy treatment could be undertaken and, during chemotherapy, further transfusions would be necessary. According to Dr. Lanzkowsky, the pediatric cancer from which Phillip was suffering, although widespread, responds to treatment, with 75% of the patients going into remission for a period from several months to years and a cure rate among these patients of 25 to 30%.
Without treatment, the patient was certain to die, probably within a month, during which time he would have a great deal of pain. The doctor said there was a need for immediate action. He stated that an unmanageable emergency could arise at any moment and that any delay was harmful to the patient.
*727 The patient and his parents were again called as witnesses at the continued hearing on April 13th. Phillip’s stepfather testified that he had raised the boy from infancy but had never adopted him. He remained adamant in his refusal to accept blood transfusions as part of Phillip’s treatment. The patient’s mother, who did not know the whereabouts of her son’s natural father, stated that she wanted alternative blood management for her son and would not consent to transfusions. The family, which includes four children who are younger than Phillip, joined the Jehovah’s Witnesses in 1987. The patient testified that he began studying the teaching of the Witnesses with his family, then lost interest for a while, and returned to religious study about a year ago. He did not know the books of the Bible, which are an important part of the study of Jehovah’s Witnesses, but he did appear to understand the basic tenet of the religion’s prohibition regarding blood transfusions. He believed that if he followed the teachings of Jehovah, he would have everlasting life[2] and that if he consented to a transfusion, which is forbidden, he would not have everlasting life. However, he stated several times, that if the court ordered the transfusion, it would not be his responsibility or sin. Phillip is in his last year at the High School of Art and Design, where he is studying industrial design. He has never been away from home and has never dated a girl. He consults his parents before making decisions and when asked whether he considered himself an adult or a child, he responded "child”. There was no evidence that Phillip had been urged by his parents to make his own decision regarding blood transfusions.
At the request of the attorney appearing on behalf of Phillip and his parents, the hearing was continued for Monday afternoon, April 16, 1990, to afford them an opportunity to arrange for acceptable alternative medical treatment for Phillip. In the interim, arrangements were made to contact the court by beeper in the event an emergency developed.
When the hearing reconvened at 3:30 p.m. on April 16th, the patient’s hemoglobin had dropped to 4.9 and his hematocrit to 15.0. A biopsy of tissue taken from the right buttock area confirmed that Phillip had rhabdomyosarcoma, a form of pediatric cancer of the tissue that is to become muscle. Dr. Lanzkowsky stated that the use of erythropoietin, suggested *728 as an alternative to blood transfusions, was not feasible. This drug stimulates red cell production and it would not be effective in Phillip’s case since his bone marrow, which produces the red blood cells, was contaminated with malignant cells. The attorney representing the patient and his parents did not have a doctor present to testify to alternative medical treatment that did not involve the use of blood transfusions. However, he informed the court that a Dr. Edwin Fondo and a Dr. Stephen Malamud could have the patient transferred to Beth Israel Hospital for such treatment. In attempting to confirm the transfer, petitioner’s attorney learned that Dr. Fondo had been suspended from Beth Israel Hospital. A conference call was then arranged with Dr. Stephen Malamud who, upon being informed of the patient’s condition, stated that he could not treat him without a blood transfusion. In view of this, the court authorized an immediate transfusion of 1,000 cc. for Phillip, and entered an order to that effect. The court did not authorize chemotherapy or further blood transfusions, preferring to give the attorney for the Witnesses an opportunity to go to the Appellate Division on April 17th; and to give the parents an opportunity to transfer Phillip to Beth Israel, if they so desired.
The transfusion of the 1,000 cc. of blood ordered by the court on April 16, 1990 was performed in several stages and completed by the following day. On April 18, 1990 the court was notified that the respondent’s hemoglobin count was 10.6 and his hematocrit was 32. Nevertheless, chemotherapy had not commenced because neither Dr. Lanzkowsky at Long Island Jewish Medical Center, nor Dr. Malamud at Beth Israel Hospital would agree to treat the patient with chemotherapy without authorization from the court for blood transfusions if they become "medically necessary” during the course of the chemo treatment.
THE LAW
It is well-settled law in this, and most other jurisdictions, that a competent adult has a common-law right to refuse medical treatment.[3] In addition, this right has been codified by statute.[4] However, when the adult is incompetent, the court *729 has an obligation to decide whether life-saving treatment should be given or not. If the adult had once been competent, the court can order the "respirator” (for example) to be turned off if it is convinced by clear and convincing evidence that this was the patient’s desire before becoming incompetent. However, when the patient is a minor, the court must act parens patriae (in place of the parents); because parents may throw their own lives away, if they wish, but they cannot make martyrs of their children.[5]
Counsel for the patient and his parents posed the following legal question. Does an intelligent, articulate young man, just weeks shy of his 18th birthday, have due process right to demonstrate his capacity to make medical decisions for himself consistent with his values and convictions before he loses the right to control what is done to his body? This concept has been recently adopted by the highest court in Illinois.[6] The Supreme Court of Illinois said, "If the evidence is clear and convincing that the minor is mature enough to appreciate the consequences of her actions, and that the minor is mature enough to exercise the judgment of an adult, then the mature minor doctrine affords her the common law right to consent to or refuse medical treatment.” (Emphasis added.)[7] Tennessee has also accepted the "mature minor” doctrine.[8] The Supreme Court of Tennessee noted that the mature minor doctrine is not a recent development in Tennessee law. It stated, "recognition that minors achieve varying degrees of maturity and responsibility (capacity) has been part of the common law for well over a century.”[9]
Should one equate the right to consent to medical treatment with the right to refuse medical treatment? If so, there are numerous instances in our State’s statutory law that permit minors to consent to treatment for out-patient mental health services;[10] treatment for substance abuse;[11] and treatment for sexually transmitted diseases.[12] In addition, minors over the *730 age of 16 can consent to in-patient mental health treatment.[13] Pregnant minors and minors who are parents are treated like adults for decision-making capacity for their own and their children’s health care.[14]
CONCLUSION
While this court believes there is much merit to the "mature minor” doctrine, I find that Phillip Malcolm is not a mature minor. Therefore, his refusal to consent to blood transfusions is not based upon a mature understanding of his own religious beliefs or of the fatal consequences to himself.[15] It is recommended that the Legislature or the appellate courts take a hard look at the "mature minor” doctrine and make it either statutory or decisional law in New York State.[16]

. Genesis 9:3-4; Leviticus 3:17,17:10-14; Deuteronomy 12:23; Acts 15:29.

. Jehovah’s Witnesses believe that when the Messiah (Christ) comes back to earth, the dead will be resurrected to everlasting life.

. Schloendorff v Society of N. Y. Hosp., 211 NY 125; Matter of Storar, 52 NY2d 363, cert denied sub nom. Storar v Storar, 454 US 858; Matter of Fosmire v Nicoleau, 75 NY2d 218.

. Public Health Law §§ 2504, 2805-d.

. Prince v Massachusetts, 321 US 158, 170; Matter of Fosmire v Nicoleau, supra, at 221.

. In re E.G., 133 Ill 2d 98, 549 NE2d 322.

. In re E.G., supra, 133 Ill 2d, at 110, 549 NE2d, at 327-328.

. Cardwell v Bechtol, 724 SW2d 739 (Tenn 1987).

. Cardwell v Bechtol, supra, 724 SW2d, at 744-745.

. Mental Hygiene Law § 33.21 (c), (d).

. Mental Hygiene Law § 21.11 (c).

. Public Health Law § 2305 (2).

. Mental Hygiene Law § 9.13 (a).

. Public Health Law § 2504 (1), (3).

. The court signed an order on April 18, 1990 giving the doctors at Long Island Jewish and Beth Israel Hospitals the authority to administer blood transfusions whenever medically necessary during chemotherapy. Phillip was transferred to Beth Israel Hospital on April 19, and he is presently responding well to chemotherapy. In a few weeks he will become an adult; and, of course, his life will then be in his own hands.

. If the mature minor doctrine becomes law in New York, this court strongly recommends that a hearing be held first to determine whether the minor is mature or not. If he or she is, then that ends the matter. If the minor is found to be immature, then the hearing should continue without the minor’s presence. It is a terrible psychological shock to the patient to hear for the first time how serious his or her physical condition is and how minimal are the chances of survival.