**Kara and Morris NEWMARK, Respondent Below, Appellant,**

v.

**Teresa WILLIAMS/DCPS, Petitioner Below, Appellee.**

Supreme Court of Delaware.

Submitted: Sept. 14, 1990.
Oral Decision: Sept. 14, 1990.
Written Decision: April 2, 1991.

---

A. Gilchrist Sparks, III, Morris, Nichols, Arsht & Tunnell, Wilmington, Yosef J. Riemer (argued), and Karen N. Walker of Kirkland & Ellis, Washington, D.C., of counsel, for appellants.

Janice R. Tigani (argued), Richard E. Fairbanks, Jr., Loren C. Meyers and Timothy J. Donovan, Jr., Dept. of Justice, Wilmington, for the State. .

Before MOORE, WALSH and HOLLAND, JJ.

MOORE, Justice.

Colin Newmark[1], a three year old child, faced death from a deadly aggressive and advanced form of pediatric cancer known as Burkitt's Lymphoma. We were presented with a clash of interests between medical science, Colin's tragic plight, the unquestioned sincerity of his parents' religious beliefs as Christian Scientists, and the legal right of the State to protect dependent children from perceived neglect when medical treatment is withheld on religious grounds. The Delaware Division of Child Protective Services ("DCPS") petitioned the Family Court for temporary custody of Colin to authorize the Alfred I. duPont Institute ("duPont Institute"), a nationally recognized children's hospital, to treat Colin's condition with chemotherapy. His parents, Morris and Kara Newmark, are well educated and economically prosperous. As members of the First Church of Christ, Scientist ("Christian Science") they rejected medical treatment proposed for Colin, preferring instead a course of spiritual aid and prayer.[2] The parents rely

1. We have used pseudonyms to protect the privacy of Colin and his family.

2. Mary Baker Eddy, the founder of the Christian Science Church, professed a deep belief in

upon provisions of Delaware law, which exempt those who treat their children's illnesses *"solely* by spiritual means" from the abuse and neglect statutes. Thus, they opposed the State's petition. *See* 10 *Del.C.* § 901(11) & 16 *Del.C.* § 907 (emphasis added). The Newmarks also claimed that removing Colin from their custody would violate their First Amendment right, guaranteed under the United States Constitution, to freely exercise their religion.

The Family Court rejected both of these arguments and awarded custody of Colin to DCPS. *See Williams v. Newmark,* Del. Fam.Ct., No. CN90–9235, Conner, J., slip op. (Sept. 12, 1990). The trial court, however, issued a stay permitting the Newmarks to file an immediate appeal to this Court. *Id.*

We heard this appeal on an emergency basis. After argument on September 14, 1990, we issued an order reversing the Family Court and returned custody of Colin to his parents. *See Newmark v. Williams,* Del.Supr., No. 325, 1990, Moore, J. (Sept. 14, 1990) (ORDER). At that time we noted that this more detailed opinion would follow in due course.

 We have concluded that Colin was not an abused or neglected child under Delaware law. Parents enjoy a well established legal right to make important decisions for their children. Although this right is not absolute, the State has the burden of proving by clear and convincing evidence that intervening in the parent-child relationship is necessary to ensure the safety or health of the child, or to protect the public at large. DCPS did not meet this heavy burden. This is especially true where the purpose of the custody petition

was to administer, over the objections of Colin's parents, an extremely risky, toxic and dangerously life threatening medical treatment offering less than a 40% chance for "success".

## I.

Colin was the youngest of the three Newmark children. In late August, 1990, the Newmarks noticed that he had lost most of his appetite and was experiencing frequent vomiting. The symptoms at first appeared occasionally but soon worsened.

The Newmarks reluctantly took Colin to the duPont Institute for examination. The parties stipulated that this violated the Newmarks' Christian Science beliefs in the effectiveness of spiritual healing. The parties further stipulated that the Newmarks acted out of concern for their potential criminal liability, citing a Massachusetts case which held parents liable for manslaughter for foregoing medical treatment and treating their minor child only in accordance with Christian Science tenets.

Dr. Charles L. Minor, a duPont Institute staff pediatric surgeon, examined Colin and ordered X-rays of his stomach. Dr. Minor found the X-rays inconclusive and suggested that Colin remain at the hospital for further testing. The Newmarks refused and took Colin home. Colin remained at home for approximately one week while receiving treatments under the care of a Christian Science practitioner. Colin's symptoms nonetheless quickly reappeared and the Newmarks returned him to hospital.

Dr. Minor ordered a second set of X-rays and this time discovered an obstruction in

spirituality. She preached that sickness was a manifestation of a diseased mind. *See* Eddy, *Sermon Subject Christian Science Healing* 7–8 (Pamphlet 1886). Eddy therefore claimed that "[m]edicine will not arrive at the Science of treating disease until disease is treated mentally and man is healed morally and physically." *Id.* at 17. Accordingly, Christian Scientists do not treat most sicknesses with medical care. Rather, they rely on practitioners who administer spiritual aid. *See* Schneider, *Christian Science and the Law: Room for Compromise?* 1 Colum. J.L. & Soc.Probs. 81, 81 (1965).

Eddy also believed that childhood illnesses were more manifestations of their parents' own spiritual infirmities. She reasoned that "[t]he law of mortal mind and [parents'] own fears govern [their] own child more than the child's mind governs itself and they produce the very results which might have been prevented through the opposite." M. EDDY, SCIENCE AND HEALTH WITH KEY TO THE SCRIPTURES 154 (1934).

Colin's intestines. The doctor suggested immediate surgery and, again, the Newmarks consented. The Newmarks considered the procedure "mechanical" and therefore believed that it did not violate their religious beliefs.

During the operation, Dr. Minor discovered a large mass 10 to 15 centimeters wide connecting Colin's large and small bowels. He also noticed that some of Colin's lymph nodes were unusually large. Dr. Minor removed the mass and submitted tissue samples for a pathological report. There were no complications from the surgery and Colin was recovering "well."

The pathology report confirmed that Colin was suffering from a non-Hodgkins Lymphoma. Five pathologists from Children's Hospital, Philadelphia, Pennsylvania, confirmed the diagnosis. Dr. Minor, after receiving the pathology report, contacted Dr. Rita Meek, a board certified pediatric hematologist-oncologist and an attending physician at the duPont Institute.

Dr. Meek ordered two blood tests which indicated the presence of elevated levels of uric acid and LHD in Colin's system. The presence of these chemicals indicated that the disease had spread. Dr. Meek then conducted an external examination and detected a firm mass growing above Colin's right testicle. She diagnosed Colin's condition as Burkitt's Lymphoma, an aggressive pediatric cancer.[3] The doctor recommended that the hospital treat Colin with a heavy regimen of chemotherapy.

Dr. Meek opined that the chemotherapy offered a 40% chance of "curing" Colin's illness. She concluded that he would die within six to eight months without treatment. The Newmarks, learning of Colin's condition only after the surgery, advised Dr. Meek that they would place him under the care of a Christian Science practitioner and reject all medical treatment for their son. Accordingly, they refused to authorize the chemotherapy. There was no doubt that the Newmarks sincerely believed, as part of their religious beliefs, that the tenets of their faith provided an effective treatment.

## II.

We start with an overview of the relevant Delaware statutory provisions. Delaware law defines a neglected child as:

[A] child whose physical, mental or emotional health and well-being is threatened or impaired because of inadequate care and protection by the child's custodian, who has the ability and financial means to provide for the care but does not or will not provide adequate care; or a child who has been abused or neglected as defined by § 902 of Title 16. 10 *Del.C.* § 901(11).

Section 902 of Title 16 further defines abuse and neglect as:

[P]hysical injury by other than accidental means, injury resulting in a mental or emotional condition which is a result of abuse or neglect, negligent treatment, sexual abuse, maltreatment, mistreatment, *nontreatment*, exploitation or abandonment, of a child under the age of 18. (Emphasis added).

Sections of the Delaware Code, however, contain spiritual treatment exemptions which directly affect Christian Scientists. Specifically, the exemptions state:

No child who in good faith is under treatment *solely by spiritual means* through prayer in accordance with the tenets and practices of a *recognized* church or religious denomination by a *duly accredited* practitioner thereof *shall for that reason alone* be considered a neglected child for purposes of this chapter.

10 *Del.C.* § 901(11) & 16 *Del.C.* § 907 (emphasis added). These exceptions reflect the intention of the Delaware General Assembly to provide a "safe harbor" for parents, like the Newmarks, to pursue their own religious beliefs. This is evident from the limited legislative history available on the subject. *See* 10 *Del.C.* § 901(11) & 16 *Del.C.* § 907; *cf. A & P Stores v. Hannigan*, Del.Supr., 367 A.2d 641, 643 (1976)

---

**3.** Dr. Meek testified that Burkitt's Lymphoma cancer cells double more rapidly than any other form of pediatric cancer which inevitably results in a fast growing tumor.

(reference to legislative history appropriate where statutory language vague).

As originally enacted in 1972, one of the spiritual healing exemptions appeared in the child abuse reporting section of the Code, under the general heading of "Immunity from liability." The statute included both the spiritual treatment exemption and an immunity provision applicable to reporting child abuse. *See* 58 Del. Laws 154 (1972). The General Assembly later amended this section of the Code in 1976 and placed the spiritual treatment exemption under a separate heading entitled "Child Under Treatment By Spiritual Means Not Neglected." *See* 60 Del. Laws 494 (1976); 16 *Del.C.* § 907. The amendment reflects the legislature's apparent intent to clarify the meaning of the exemption and to magnify its importance. The accuracy of this conclusion is less in doubt after considering the legislative history of the other identical exemption.

The General Assembly also amended the meaning of a "neglected child" in the section of the Code dealing with the Family Court. *See* 10 *Del.C.* § 901(11). The statute originally defined a neglected child as one "whose custodian refuses to provide him with adequate care." 58 Del. Laws 114 (1971). In 1978, the legislature changed the definition of a "neglected child" to include the spiritual treatment exemption found in 16 *Del.C.* § 907. *See* 61 Del. Laws 334 (1978). The amendment clearly reflects the General Assembly's intent to provide protection for parents who treat their children through statutorily defined spiritual means. Accordingly, our ruling from the bench noted that the spiritual treatment exemptions reflect, in part, "[t]he policy of this State with respect to the quality of life" a desperately ill child might have in the caring and loving atmosphere of his or her family, versus the sterile hospital environment demanded by physicians seeking to prescribe excruciating, and life threatening, treatments of doubtful efficacy.

With the considerable reflection that time has now permitted us in examining these issues, we recognize the possibility that the spiritual treatment exemptions [4] may violate the ban against the establishment of an official State religion guaranteed under both the Federal [5] and Delaware Constitutions.[6] Clearly, in both reality and practical effect, the language providing an exemption only to those individuals practicing "in accordance" with the "practices of a *recognized* church or religious denomination by a *duly accredited practitioner* thereof" is intended for the principal benefit of Christian Scientists.[7] Our concern is

---

**4.** We express no view, and indeed, this case does not concern the good faith healing defense contained in the Delaware Criminal Code. *See* 11 *Del.C.* § 1104.

**5.** The First Amendment of the United States Constitution states, in part, that "Congress shall make no law respecting an establishment of religion ..." U.S. Const. amend. I. The First Amendment is applicable to the states through the Fourteenth Amendment. *See Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940).

**6.** The Delaware Constitution provides, in part, that the law should grant no "preference ... to any religious societies, denominations, or modes of worship." Del. Const. art. I, § 1.

**7.** The terminology used in the spiritual treatment exemption indicates that the statute was enacted as a result of a Christian Science lobbying effort. *See In Child Deaths, a Test for Christian Science,* N.Y. Times, Aug. 6, 1990, at 1, col. 2 (exemptions to neglect statutes passed at behest of Christian Science Church in forty state legislatures). Specifically, the requirement that a person must be a "duly accredited practitioner" mirrors the Christian Science belief that only "practitioners" receiving approval from the Christian Science Mother Church can conduct spiritual healing. *See* Schneider, *Christian Science and the Law: Room for Compromise?,* 1 Colum.J.L. & Soc.Probs. 81, 81 (1965); *see also Walker v. Super. Ct. Sacramento Co.,* 47 Cal.3d 112, 147–48, 763 P.2d 852, 875, 253 Cal.Rptr. 1, 24 (1988) (Mosk, J., concurring), *cert. denied,* 491 U.S. 905, 109 S.Ct. 3186, 105 L.Ed.2d 695 (1989) (Christian Scientists sponsored spiritual treatment exception to abuse and neglect law in California and therefore it is "more than a fortuity that the word 'practitioner' " appears in California spiritual healing statute). The influence of the Church of Christ Scientist on the Delaware exemptions is also apparent when those statutes are compared with the federal spiritual healing exemption, which the Department of Health, Education and Welfare ("HEW") adopted in response to the Child Abuse Prevention and Treatment Act of 1974. *See* 45 C.F.R. § 1340.1 (1990). The federal regulation pro-

that it possibly forces us to impermissibly determine the validity of an individual's own religious beliefs.[8]

vides that "[n]othing in this part should be construed *as requiring or prohibiting* a finding of negligent treatment or maltreatment when a parent *practicing his or her religious beliefs* does not, for that reason alone, provide medical treatment for a child...." 45 C.F.R. § 1340.2(d)(2)(ii) (1990). (Emphasis added). The states were required to enact statutes similar to the HEW regulations to qualify for federal funds. *See* Comment, *Faith Healing and Religious Treatment Exemptions To Child Endangerment Laws: Should Parental Religious Practices Excuse The Failure To Provide Necessary Medical Care To Children?*, 13 U.Dayton L.Rev. 79, 96 (1987) (written by LeClair). Tellingly, the statute the General Assembly enacted to adopt the Child Abuse Prevention and Treatment Act of 1974 in Delaware merely incorporated the prior version of the Delaware exemption including the language "duly accredited practitioner" and "recognized religion." *See* 16 *Del.C.* § 907; 60 Del.Laws 494 (1976) (synopsis). It is perhaps more than coincidental that the legislature merely carried over the exemption without amending it to conform with the new federal regulations. Certainly, any statute passed as the result of the efforts of one religious group to benefit that one particular group to the exclusion of others bears a strong presumption against its validity as a direct violation of the Establishment Clause.

**8.** At least one state court has ruled that a statutory exemption to a criminal abuse and neglect statute, containing identical language as the Delaware statutes, violated both the Establishment Clause and the Equal Protection Clause of the Fourteenth Amendment. *See State v. Miskimens,* 22 Ohio Misc.2d 43, 43–46, 490 N.E.2d 931, 933–36 (Ohio Ct.Com.Pl.1984); OHIO REV. CODE ANN. § 2919.22(A) (Page 1990) (no violation of "care, protection, or support" when parent treats child's infirmity "by spiritual means through prayer alone, *in accordance with* the tenets of a *recognized religious* body.") (Emphasis added). *Miskimens* found that the statute "hopelessly involved" the state in issues involving religious beliefs and served no "legitimate purpose." *Id.* at 45, 490 N.E.2d at 934–35.

Justice Mosk, of the California Supreme Court, observed that a California statute, exempting parents from criminal child neglect if they treat their child "in accordance with the tenets and practices of a recognized church or religious denomination, by a duly accredited practitioner thereof" violated the Equal Protection Clause of the First Amendment. *Walker,* 47 Cal.3d at 144–51, 763 P.2d at 874–78, 253 Cal.Rptr. at 22–27 (Mosk, J., concurring). Justice Mosk recognized that the statute specifically excluded both parents who are not members of a recognized religion and parents of a recognized religion who nonetheless do not treat

their children through an accredited practitioner. *Id.* at 146–47, 763 P.2d at 874–75, 253 Cal. Rptr. at 23–24. The Justice opined that the statute served no legitimate state function and agreed with the reasoning in *Miskimens* that the exemption would involve the court in a "troubling entanglement of church and state...." *Id.* at 150, 763 P.2d at 877, 253 Cal.Rptr. at 26.

The reasoning applied in *Miskimens* and the concurrence in *Walker* is a firmly rooted principle of constitutional law. Numerous state courts have already ruled that a statutory exemption violates the Establishment Clause when it only applies to members of a "recognized" church or religion. *See Davis v. State,* 294 Md. 370, 381, 451 A.2d 107, 113 (1982) (immunization exception for members of "recognized" religion "contravenes ... principle of governmental neutrality regarding different religious beliefs."); *Maier v. Besser,* 73 Misc.2d 241, 245, 341 N.Y.S.2d 411, 414 (N.Y.Sup.Ct.1972) ("if the Legislature desires to exempt for religious grounds a certain class of persons, it must do so on a logical and non-discriminatory basis."); *Dalli v. Bd. of Ed.,* 358 Mass. 753, 759, 267 N.E.2d 219, 222–23 (1971) (same); *Kolbeck v. Kramer,* 84 N.J.Super. 569, 574, 202 A.2d 889, 892 (1964) ("[t]here is no right in a state or an instrumentality thereof to determine that a cause is not a religious one."); *Cf. Wilmington Housing Authority v. Greater St. John Baptist Church,* Del. Supr., 291 A.2d 282, 286 (1972) (any preference for religious organizations in determining applicability of depreciation statute "may encounter serious constitutional questions").

The Supreme Court of the United States has similarly ruled on numerous occasions that a statute violates the Establishment Clause of the First Amendment if it requires the State to act or refrain from acting on the basis of whether it recognizes a certain religious belief. *See Cantwell v. Connecticut,* 310 U.S. 296, 307, 60 S.Ct. 900, 904–05, 84 L.Ed. 1213 (1940) (statute which permits state to issue license only when convinced "cause is a religious ... lay[s] a forbidden burden upon the exercise of liberty protected by the Constitution"); *U.S. v. Ballard,* 322 U.S. 78, 86–87, 64 S.Ct. 882, 886, 88 L.Ed. 1148 (1944) (Establishment Clause "embraces the right to maintain theories of life and of death ... which are rank heresy to followers of the orthodox faiths ... [y]et the fact that [religious beliefs] may be beyond the ken of mortals does not mean that they can be made suspect before the law."); *Larson v. Valente,* 456 U.S. 228, 244, 102 S.Ct. 1673, 1683, 72 L.Ed.2d 33, *reh'g denied,* 457 U.S. 1111, 102 S.Ct. 2916, 73 L.Ed.2d 1323 (1982) ("clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another.")

The Court recognized in *Larson* that statutory provisions tending to discriminate "*among* religions" are subject to strict scrutiny requiring a

Neither party challenged the constitutionality of the spiritual treatment exemptions in either the Family Court or on appeal. Thus, except to recognize that the issue is far more complicated than was originally presented to us, we must leave such questions for another day.

### III.

■ Addressing the facts of this case, we turn to the novel legal question whether, under any circumstances, Colin was a neglected child when his parents refused to accede to medical demands that he receive a radical form of chemotherapy having only a forty percent chance of success. Other jurisdictions differ in their approaches to this important and intensely personal issue. Some courts resolved the question on an *ad hoc* basis, without a formal test, concluding that a child was neglected if the parents refused to administer chemotherapy in a life threatening situation. *See In re Willmann*, 24 Ohio App.3d 191, 199, 493 N.E.2d 1380, 1389 (1986); *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn.Ct.App.1983). The California Court of Appeals in *In re Ted B.*, 189 Cal.App.3d 996, 235 Cal.Rptr. 22 (1987), employed the best interests test to determine if a child was neglected when his parents refused to permit treatment of his cancer with "mild" chemotherapy following more intense treatment. *Id.* at 1006, 235 Cal.Rptr. at 27. *Ted B.* weighed the gravi-

ty, or potential gravity of the child's illness, the treating physician's medical evaluation of the course of care, the riskiness of the treatment and the child's "expressed preferences" to ultimately judge whether his parents' decision to withhold chemotherapy served his "best interests." *Id.* at 1005, 235 Cal.Rptr. at 27. Finally, the Supreme Judicial Court of Massachusetts, in *Custody Of A Minor*, 375 Mass. 733, 379 N.E.2d 1053 (1978), utilized a tripartite balancing test which weighed the interests of the parents, their child and the State to determine whether a child was neglected when his parents refused to treat his leukemia with non-invasive chemotherapy. *Id.* at 747, 379 N.E.2d at 1061–62. *See also* Note, *State Intrusion into Family Affairs: Justifications and Limitations*, 26 Stan.L. Rev. 1383, 1383–84 (1974) (written by Baskin).

In the present case, the Family Court did not undertake any formal interest analysis in deciding that Colin was a neglected child under Delaware law. *See Williams v. Newmark*, Del.Fam.Ct., No. CN90–9235, Conner, J., slip op. (Sept. 12, 1990). Instead, the trial court used the same *ad hoc* approach as the Ohio and Tennessee courts respectively employed in *Willmann* and *Hamilton*. *Id.* Specifically, the Family Court rejected the Newmarks' proposal to treat Colin by spiritual means under the care of a Christian Science practitioner. The trial judge considered spiritual treat-

"closely fitted" statute to "further a 'compelling governmental interest.'" *Id.* 456 U.S. at 251, 102 S.Ct. at 1687. (Emphasis in original). The *Larson* Court also recognized that the statute in that case would foster "'an excessive governmental entanglement with religion'" and thus violate one of three tests first announced in *Lemon v. Kurtzman*, 403 U.S. 602, 612–613, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 *reh'g denied*, 404 U.S. 876, 92 S.Ct. 24, 30 L.Ed.2d 123 (1971), to determine whether a statute which applied *equally* to all religions violated the Establishment Clause. *Id.* 456 U.S. at 251, 102 S.Ct. at 1687. Although unnecessary to judge the constitutionality of statutes which *discriminate* among various religious beliefs, the Ohio Court of Common Pleas, in *Miskimens*, utilized the entanglement test to strike down its own spiritual treatment exemption to the neglect statutes. 22 Ohio Misc.2d at 47, 490 N.E.2d at 934. *See Walker*, 47 Cal.3d at 150, 763 P.2d at 877, 253 Cal.Rptr. at 26.

Application of the Delaware exemption possibly raises the same concerns that *Miskimens* recognized. Most importantly, the Delaware statutes would require this Court to determine, as an initial matter, whether a certain religion is worthy of official recognition. This inquiry, as *Miskimens* understood, "hopelessly involves the State in a determination of questions which should not be the subject of governmental inquisition and potential public ridicule" which in turn violates the *Lemon* "excessive entanglement" test. 22 Ohio Misc.2d at 45, 490 N.E.2d at 934. It is noteworthy that at least in another context, the Delaware Superior Court has already refused the opportunity to decide whether to recognize a certain religious group. *See State v. Cubbage*, Del.Super., 210 A.2d 555, 562 (1965) (Black nationalist movement named "Black Muslims" considered religion for purposes of religious freedom suit because "this Court cannot or should not undertake to define or rule on what is or what is not a religion.")

ment an inadequate alternative to chemotherapy. *Id.* at 8. The court therefore concluded that "[w]ithout any other factually supported alternative" the Newmarks' decision to refuse chemotherapy "constitute[d] inadequate parental care for their son who is in a life threatening situation and constitute[d] neglect as defined in the Delaware statute." *Id.* at 9, 11.

■■■ This Court reviews the trial court's application of legal precepts involving issues of law *de novo. See Fiduciary Trust Co. v. Fiduciary Trust Co.,* Del. Supr., 445 A.2d 927, 936 (1982). While we do not recognize the primacy of any one of the tests employed in other jurisdictions, we find that the trial court erred in not explicitly considering the competing interests at stake. The Family Court failed to consider the special importance and primacy of the familial relationship, including the autonomy of parental decision making authority over minor children. The trial court also did not consider the gravity of Colin's illness in conjunction with the invasiveness of the proposed chemotherapy and the considerable likelihood of failure. These factors, when applied to the facts of this case, strongly militate against governmental intrusion.

#### A.

Any balancing test must begin with the parental interest. The primacy of the familial unit is a bedrock principle of law. *See Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972) (citing cases); *Betty J.B. v. Division of Social Services,* Del.Supr., 460 A.2d 528, 532 (1983) ("State and society in general have a fundamental interest in preserving and protecting the family unit."); *Cf. Petitioner F. v. Respondent R.,* Del.Supr., 430 A.2d 1075, 1080 (1981). We have repeatedly emphasized that the parental right is sacred which can be invaded for only the most compelling reasons. *See Matter of Burns,* Del.Supr., 519 A.2d 638, 645 (1986); *Daber v. Division of Child Protective Services,* Del.Supr., 470 A.2d 723, 726 (1983). Indeed, the Delaware General Assembly has stated that the preservation of the family is "fundamental to the maintenance of a stable, democratic society...." 10 *Del.C.* § 902(a); *see* 16 *Del.C.* § 901 (abuse, neglect reporting statute designed to ensure strength of "parental care.")

Courts have also recognized that the essential element of preserving the integrity of the family is maintaining the autonomy of the parent-child relationship. *See Quilloin v. Walcott,* 434 U.S. 246, 255, 98 S.Ct. 549, 554, 54 L.Ed.2d 511, *reh'g denied,* 435 U.S. 918, 98 S.Ct. 1477, 55 L.Ed.2d 511 (1978); *Wisconsin v. Yoder,* 406 U.S. 205, 232, 92 S.Ct. 1526, 1541, 32 L.Ed.2d 15 (1972) ("primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition."); *Pierce v. Society of Sisters,* 268 U.S. 510, 534–35, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925). In *Prince v. Commonwealth of Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645, *reh'g denied,* 321 U.S. 804, 64 S.Ct. 784, 88 L.Ed. 1090 (1944), the United States Supreme Court announced:

> It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder. *Id.*

Parental autonomy to care for children free from government interference therefore satisfies a child's need for continuity and thus ensures his or her psychological and physical well-being. *See* Goldstein, *Medical Care for the Child at Risk: On State Supervention of Parental Autonomy,* 86 Yale L.J. 645, 649 & n. 13 & 14 (1977); Baskin, *supra,* at 1386.

■■■ Parental authority to make fundamental decisions for minor children is also a recognized common law principle. A doctor commits the tort of battery if he or she performs an operation under normal circumstances without the informed consent of the patient. *See* W. PROSSER & W. KEETON, THE LAW OF TORTS § 18 at 114 (5th ed. 1984). Tort law also assumes that a child does not have the capacity to consent to an operation in most situations. *Id.* § 118 at 114–115. Thus, the common

law recognizes that the only party capable of authorizing medical treatment for a minor in "normal" circumstances is usually his parent or guardian. *Id.* § 118 at 115.

Courts, therefore, give great deference to parental decisions involving minor children. In many circumstances the State simply is not an adequate surrogate for the judgment of a loving, nurturing parent. *See* Baskin, *supra*, at 1386. As one commentator aptly recognized, the "law does not have the capacity to supervise the delicately complex interpersonal bonds between parent and child." Goldstein, *supra*, at 650.

### B.

■■■■ We also recognize that parental autonomy over minor children is not an absolute right. Clearly, the State can intervene in the parent-child relationship where the health and safety of the child and the public at large are in jeopardy. *See Prince*, 321 U.S. at 166–67, 64 S.Ct. at 442; *Matter of Burns* 519 A.2d at 645; *Daber*, 470 A.2d at 726; *In re D.L.E.*, 645 P.2d 271, 276 (Colo.1982) (en banc); *State v. Perricone*, 37 N.J. 463, 474, 181 A.2d 751, 757 (1962). Accordingly, the State, under the doctrine of *parens patriae*, has a special duty to protect its youngest and most helpless citizens.

The *parens patriae* doctrine is a derivation of the common law giving the State the right to act on behalf of minor children in certain property and marital disputes. *See In Re Hudson*, 13 Wash.2d 673, 126 P.2d 765, 777 (1942). More recently, courts have accepted the doctrine of *parens patriae* to justify State intervention in cases of parental religious objections to medical treatment of minor children's life threatening conditions. *See In re Application of L.I. Jewish Med. Ctr.*, 147 Misc.2d 724, 729, 557 N.Y.S.2d 239, 243 (N.Y.Sup.Ct.1990); *In re Eric B.*, 189 Cal.App.3d at 1003, 235 Cal.Rptr. at 25; *In re Willmann*, 24 Ohio App.3d at 198, 493 N.E.2d at 1388; *In re Hamilton*, 657 S.W.2d at 429; *Custody Of*

*A Minor*, 375 Mass. at 754–56, 379 N.E.2d at 1066–67. The Supreme Court of the United States succinctly described the *parens patriae* concept in *Prince*, 321 U.S. at 170, 64 S.Ct. at 444. The Court found that parental autonomy, under the guise of the parents' religious freedom, was not unlimited. *Id.* Rather, the Court held:

> Parents may be free to become martyrs themselves. But it does not follow they are free, in identical circumstances, to make martyrs of their children before they have reached the age of full and legal discretion when they can make that choice for themselves. *Id.*

The basic principle underlying the *parens patriae* doctrine is the State's interest in preserving human life. *See Cruzan v. Director, Missouri Dept. of Health,* —— U.S. ——, 110 S.Ct. 2841, 2853, 111 L.Ed.2d 224 (1990) (State may "assert an unqualified interest in the preservation of human life...."); *Custody Of A Minor*, 375 Mass at 755, 379 N.E.2d at 1066. Yet this interest and the *parens patriae* doctrine are not unlimited. In its recent *Cruzan* opinion, the Supreme Court of the United States announced that the state's interest in preserving life must "be weighed against the constitutionally protected interests of the individual." —— U.S. ——, 110 S.Ct. 2841, 2853 (1990).

The individual interests at stake here include both the Newmarks' right to decide what is best for Colin and Colin's own right to life. We have already considered the Newmarks' stake in this case and its relationship to the *parens patriae* doctrine. The resolution of the issues here, however, is incomplete without a discussion of Colin's interests.

### C.

All children indisputably have the right to enjoy a full and healthy life. Colin, a three year old boy, unfortunately lacked the ability to reach a detached, informed decision regarding his own medical care.[9]

---

**9.** Other jurisdictions have respected and upheld a minor's decision regarding his own medical care only when the child presented clear and

convincing evidence that he was mature enough to exercise an adult's judgment and understood the consequences of his decision. *See, e.g., In re*

This Court must therefore substitute its own objective judgment to determine what is in Colin's "best interests." *See In re Ted B.*, 189 Cal.App.3d at 1005, 235 Cal. Rptr. at 27; *Custody Of A Minor*, 375 Mass. at 753, 379 N.E.2d at 1065.

There are two basic inquiries when a dispute involves chemotherapy treatment over parents' religious objections. The court must first consider the effectiveness of the treatment and determine the child's chances of survival with and without medical care. *See In re Ted B.*, 189 Cal.App.3d at 1005, 235 Cal.Rptr. at 27; *Custody of a Minor*, 375 Mass. at 753–54, 379 N.E.2d at 1065. The court must then consider the nature of the treatments and their effect on the child. *Id.*

The "best interests" analysis is hardly unique or novel. Federal and State courts have unhesitatingly authorized medical treatment over a parent's religious objection when the treatment is relatively innocuous in comparison to the dangers of withholding medical care. *See Application of President & Directors of Georgetown College, Inc.*, 331 F.2d 1000, 1007 (D.C.Cir.), *reh'g denied*, 331 F.2d 1010, *cert. denied*, 377 U.S. 978, 84 S.Ct. 1883, 12 L.Ed.2d 746 (1964) (better than 50% chance of saving life with blood transfusion); *Jehovah's Witnesses In State of Washington v. King Co. Hospital Unit No. 1*, 278 F.Supp. 488, 503 (W.D.Wash.1967), *aff'd*, 390 U.S. 598, 88 S.Ct. 1260, 20 L.Ed.2d 158, *reh'g denied*, 391 U.S. 961, 88 S.Ct. 1844, 20 L.Ed.2d 874 (1968) (blood transfusion authorized where "safe" and necessary); *In re Cabrera*, 381 Pa. Super 100, 101–02, 552 A.2d 1114, 1115 (1989) (blood transfusion 90% effective to treat illness); *In re D.L.E.*, 645 P.2d 271, 275 (Colo.1982) (authorization of medication to prevent epileptic seizures); *Muhlenberg Hospital v. Patterson*, 128 N.J.Super. 498, 503, 320 A.2d 518, 521 (Law Div.1974) (authorizing blood transfusion); *New Jersey v. Perricone*, 37 N.J. 463, 477, 181 A.2d 751, 759, *cert. denied*, 371 U.S. 890, 83 S.Ct. 189, 9 L.Ed.2d 124 (1962) (same); *People v. Labrenz*, 411 Ill. 618, 626, 104 N.E.2d 769, 774 (1952) (same). Accordingly, courts are reluctant to authorize medical care over parental objection when the child is not suffering a life threatening or potential life threatening illness. *See In re Green*, 448 Pa. 338, 348–49, 292 A.2d 387, 392 (1972) (court refused to authorize corrective spine surgery on minor); *In re Seiferth*, 309 N.Y. 80, 85–86, 127 N.E.2d 820, 823 (1955) (no authorization to correct cleft palate and harelip on fourteen year old minor); *but cf. In re Sampson*, 65 Misc.2d 658, 675–76, 317 N.Y.S.2d 641, 657–58 (N.Y.Fam.Ct. 1970), *aff'd*, 29 N.Y.2d 900, 328 N.Y.S.2d 686, 278 N.E.2d 918 (1972) (authorizing corrective surgery on minor where parents' only objection was blood transfusion).

The linchpin in all cases discussing the "best interests of a child", when a parent refuses to authorize medical care, is an evaluation of the risk of the procedure compared to its potential success. This analysis is consistent with the principle that State intervention in the parent-child relationship is only justifiable under compelling conditions. *See Matter of Burns*, 519 A.2d at 645; *Daber*, 470 A.2d at 726. The State's interest in forcing a minor to undergo medical care diminishes as the risks of treatment increase and its benefits decrease.

The New Jersey Supreme Court implicitly recognized this principle in the seminal *Quinlan* case decided over a decade ago. *See In re Quinlan*, 70 N.J. 10, 355 A.2d 647, *cert. denied*, 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976). In deciding that a legal custodian could authorize the

*E.G.*, 133 Ill.2d 98, 103, 139 Ill.Dec. 810, 815–16, 549 N.E.2d 322, 327–28 (1989); *cf. In re Application of L.I. Jewish Med. Ctr.*, 147 Misc.2d at 730, 557 N.Y.S.2d at 243. Although we decline to comment on the applicability of the "mature minor doctrine" under Delaware law, it is doubtful that even the most precocious three year old could meet the standard. Yet, while not dispositive, there was evidence that Colin overheard some hospital discussion about treating him with chemotherapy. His reaction was one of fright that the proposed treatment would "kill" him. Thus, even at his young age, Colin was able to perceive the very real dangers of the treatment. Given the admittedly poor odds of its success, Colin's fear of chemotherapy was not unjustified.

termination of artificial life support in certain circumstances, *Quinlan* noted that:

> [T]he State's interest *contra* weakens and the individual's right to privacy grows as the degree of bodily invasion increases and the prognosis dims. Ultimately there comes a point at which the individual's rights overcome the State interest. It is for that reason that we believe Karen's choice, if she were competent to make it, would be vindicated by the law. Her prognosis is extremely poor,—she will never resume cognitive life. And the bodily invasion is very great,—she requires 24 hour intensive nursing care, antibiotics, the assistance of a respirator, a catheter and feeding tube. *Id.* at 41, 355 A.2d at 664.

Similarly, most courts which have authorized medical treatment on a minor over parental objection have also noted that a different situation exists when the treatment is inherently dangerous and invasive. *See, e.g., In re Cabrera,* 381 Pa.Super. at 111, 552 A.2d at 1119; *Muhlenberg Hospital,* 128 N.J.Super. at 503, 320 A.2d at 521 ("if the disputed procedure involved a significant danger to the infant, the parents' wishes would be respected."); *Perricone,* 37 N.J. at 479–80, 181 A.2d at 760 (strong argument for parents if "there were substantial evidence that the treatment itself posed a significant danger to the infant's life"); *Labrenz,* 411 Ill. at 624–25, 104 N.E.2d at 773 (same); *In re Hudson,* 126 P.2d at 777 (court not permitted to authorize treatment "which would probably result in merciful release by death from [minor's] physical ... handicap.").

Applying the foregoing considerations to the "best interests standard" here, the State's petition must be denied. The egregious facts of this case indicate that Colin's proposed medical treatment was highly invasive, painful, involved terrible temporary and potentially permanent side effects, posed an unacceptably low chance of success, and a high risk that the treatment itself would cause his death. The State's authority to intervene in this case, therefore, cannot outweigh the Newmarks' parental prerogative and Colin's inherent right to enjoy at least a modicum of human dignity in the short time that was left to him.

## IV.

Dr. Meek originally diagnosed Colin's condition as Burkitt's Lymphoma. She testified that the cancer was "a very bad tumor" in an advanced disseminated state and not localized to only one section of the body. She accordingly recommended that the hospital begin an "extremely intensive" chemotherapy program scheduled to extend for at least six months.

The first step necessary to prepare Colin for chemotherapy involved an intravenous hydration treatment. This process, alone, posed a significant risk that Colin's kidneys would fail. Indeed, these intravenous treatments had already begun and were threatening Colin's life while the parties were arguing the case to us on September 14, 1990. Thus, if Colin's kidneys failed he also would have to undergo dialysis treatments. There also was a possibility that renal failure could occur during the chemotherapy treatments themselves. In addition, Dr. Meek recommended further pretreatment diagnostic tests including a spinal tap and a CAT scan.

Dr. Meek prescribed "maximum" doses of at least six different types of cancer-fighting drugs during Colin's chemotherapy. This proposed "maximum" treatment represented the most aggressive form of cancer therapy short of a bone marrow transplant. The side effects would include hair loss, reduced immunological function creating a high risk of infection in the patient, and certain neurological problems. The drugs also are toxic to bone marrow.

The record demonstrates that this form of chemotherapy also would adversely affect other parts of Colin's body. Dr. Meek stated that the doctors would have to administer the treatments through injections in the veins and spinal fluid. The chemotherapy would reduce Colin's white blood count, and it would be extremely likely that he would suffer numerous infections. Colin would require multiple blood transfu-

sions with a resultant additional risk of infection.

The treating physicians also would have to install a catheter in Colin's chest to facilitate a constant barrage of tests and treatments. Colin also would receive food through the catheter because the chemotherapy would depress his appetite. The operation to set the catheter in place would take approximately one hour. The doctors proposed to perform biopsies on both Colin's bone marrow and the lump in his groin during the procedure.

The physicians planned to administer the chemotherapy in cycles, each of which would bring Colin near death. Then they would wait until Colin's body recovered sufficiently before introducing more drugs. Dr. Meek opined that there was no guarantee that drugs alone would "cure" Colin's illness. The doctor noted that it would then be necessary to radiate Colin's testicles if drugs alone were unsuccessful. Presumably, this would have rendered him sterile.

Dr. Meek also wanted the State to place Colin in a foster home after the initial phases of hospital treatment. Children require intensive home monitoring during chemotherapy. For example, Dr. Meek testified that a usually low grade fever for a healthy child could indicate the presence of a potentially deadly infection in a child cancer patient. She believed that the Newmarks, although well educated and financially responsible, were incapable of providing this intensive care because of their firm religious objections to medical treatment.[10]

Dr. Meek ultimately admitted that there was a real possibility that the chemotherapy could kill Colin. In fact, assuming the treatment did not itself prove fatal, she offered Colin at "best" a 40% chance[11] that he would "survive."[12] Dr. Meek additionally could not accurately predict whether, if Colin completed the therapy, he would subsequently suffer additional tumors.

### A.

No American court, even in the most egregious case, has ever authorized the State to remove a child from the loving, nurturing care of his parents and subject him, over parental objection, to an invasive regimen of treatment which offered, as Dr. Meek defined the term, only a forty percent chance of "survival." For example, the California Court of Appeals ruled in *Eric B.*, that the State could conduct various procedures as part of an "observation phase" of chemotherapy over the objection of his parents. 189 Cal.App.3d at 1008–1009, 235 Cal.Rptr. at 29. The treatment included bone scans, CT scans, spinal taps and biopsies. *Id.* at 1000–1001 n. 2, 235 Cal.Rptr. at 23–24. The court specifically found that "[t]he risks entailed by the monitoring are minimal." *Id.* at 1006, 235 Cal. Rptr. at 27. The court also noted that the child would enjoy a 60% chance of survival with the treatments. *Id.* at 1005, 235 Cal. Rptr. at 27.

The Tennessee Court of Appeals awarded custody of a minor suffering from Ewing's Sarcoma to the State after her parents refused to treat the cancer with medical care. *See In re Hamilton*, 657 S.W.2d at 429. The child in that case enjoyed an at least 80% chance of temporary remission and a 25%–50% opportunity for long-term "cure". *Id.* at 427. The court specifically noted that various hospitals had successfully treated Ewing's Sarcoma in "a significant number of patients." *Id.* at 428. There was no testimony in *Hamilton*, how-

---

**10.** A doctor in a recent related case in Connecticut involving state intervention over a mother's decision to treat her minor child with traditional Chinese remedies rather than "conventional surgery" remarked that " '[i]f you do something where you need the cooperation of the entire family for the child to get better, when it's against the family's wishes your *probability of success is vastly reduced.*' " N.Y. Times, Dec. 13, 1990, at B5, col. 1 (emphasis added).

**11.** Dr. Meek based her estimate on "historical" data compiled from children who have suffered from Burkitt's Lymphoma.

**12.** Dr. Meek testified that there was no available medical data to conclude that Colin could survive to adulthood. Rather, she stated that the term "survival", as applied to victims of leukemia or lymphoma, refers only to the probability that the patient will live two years after chemotherapy without a recurrence of cancer.

ever, concerning the magnitude of the proposed chemotherapy.

The Supreme Judicial Court of Massachusetts took custody away from parents who refused to administer "mild" cancer fighting drugs after the child had already undergone more "vigorous" treatment. *See Custody of a Minor*, 375 Mass. at 755–56, 379 N.E.2d at 1058, 1067. The trial judge, in that case, specifically found that aside from some minor side effects, including stomach cramps and constipation, the chemotherapy "bore no chance of leaving the child physically incapacitated in any way." *Id.* at 751, 754, 379 N.E.2d at 1064, 1066. The trial court also ruled that the chemotherapy gave the child not only a chance to enjoy a long life "but also a 'substantial' chance for cure." *Id.* at 753, 379 N.E.2d at 1065.

The Ohio Court of Appeals awarded custody of a minor suffering from Osteogenic Sarcoma to the state when his parents consented to chemotherapy, but later refused to authorize an operation to partially remove his shoulder and entire left arm. *In re Willmann*, 24 Ohio App.3d at 193, 199, 493 N.E.2d at 1383, 1390. Although amputation is ultimately the most invasive type of surgery, there was at least a 60% chance in *Willmann* that the child would survive with the operation. *Id.* at 193, 493 N.E.2d at 1384. The court also significantly noted that the child remained at home while receiving the lower court's mandated chemotherapy treatments. *Id.* at 197, 493 N.E.2d at 1388.

Finally, the New York Supreme Court most recently ruled that the State could intervene and order chemotherapy treatments over a parent's religious objections when the medical care presented a 75% chance of short-term remission but only a 25–30% chance for "cure." *See In re Application of L.I. Jewish Med. Ctr.*, 147 Misc.2d at 725, 557 N.Y.S.2d at 241. The seventeen year old minor in that case suffered from an advanced case of Rhabdomyosarcoma, a type of pediatric cancer affecting potential muscle tissue. *Id.* at 725, 557 N.Y.S.2d at 241. This case, however, is not dispositive given the fact that the par-

ents were not wholly opposed to chemotherapy.

The minor and his parents in *L.I. Jewish Med. Ctr.*, were both members of the Jehovah's Witnesses religion and only objected to blood transfusions which were an incidental part of the prescribed medical treatment. *Id.* at 725–26, 557 N.Y.S.2d at 240–41. There was no evidence that either party objected to the chemotherapy, which included radiation treatments. *Id.* The treatments were also probably "radical" in nature given the fact that the disease had spread throughout the child's body. *Id.* at 725, 557 N.Y.S.2d at 241. This New York decision is therefore in perfect accord with other well-established precedent. Courts have consistently authorized state intervention when parents object to only minimally intrusive treatment which poses little or no risk to a child's health. *See supra* Part III.C.

### B.

The aggressive form of chemotherapy that Dr. Meek prescribed for Colin was more likely to fail than succeed. The proposed treatment was also highly invasive and could have independently caused Colin's death. Dr. Meek also wanted to take Colin away from his parents and family during the treatment phase and place the boy in a foster home. This certainly would have caused Colin severe emotional difficulties given his medical condition, tender age, and the unquestioned close bond between Colin and his family.

In sum, Colin's best interests were served by permitting the Newmarks to retain custody of their child. Parents must have the right at some point to reject medical treatment for their child. Under all of the circumstances here, this clearly is such a case. The State's important and legitimate role in safeguarding the interests of minor children diminishes in the face of this egregious record.

Parents undertake an awesome responsibility in raising and caring for their children. No doubt a parent's decision to withhold medical care is both deeply personal and soul wrenching. It need not be made

worse by the invasions which both the State and medical profession sought on this record. Colin's ultimate fate therefore rested with his parents and their faith.[13]

The judgment of the Family Court is, REVERSED.

13. Tragically, Colin died shortly after we an- nounced our oral decision.