# IN THE COURT OF APPEALS OF IOWA

No. 23-0410
Filed July 26, 2023

**IN THE INTEREST OF V.G.,**
**Minor Child,**

**STATE OF IOWA,**
    Appellant,

**COLE J. MAYER,**
    Guardian ad Litem-Appellant.
_____

Appeal from the Iowa District Court for Polk County, Romonda Belcher, District Associate Judge.

The State and guardian ad litem appeal a juvenile court order dismissing a child-in-need-of-assistance petition. **REVERSED AND REMANDED.**

Brenna Bird, Attorney General, and Mary A. Triick (until withdrawal) and Mackenzie Moran, Assistant Attorneys General, for appellant State.

Cole J. Mayer of Des Moines Juvenile Public Defender, Des Moines, attorney and guardian ad litem for minor child

G.G., Des Moines, self-represented appellee mother.

Scott L. Bandstra, Des Moines, for appellee father.

Considered by Ahlers, P.J., and Badding and Buller, JJ.

**BADDING, Judge.**

Two-year-old V.G. has cystic fibrosis—a progressive genetic disease that will eventually lead to her death. Although there is no cure for the disease, specialists in cystic fibrosis have prescribed therapies for the child that will slow its progression. But V.G.'s parents resisted some of those therapies, which led to the child being hospitalized for two weeks in August 2022.

Before she was discharged from the hospital, the child was removed from her parents' custody. The State then filed a petition alleging that she was a child in need of assistance under Iowa Code section 232.96A(5) (2022). The juvenile court returned the child to her parents in February 2023 and dismissed the State's petition the next month. The State and the child's guardian ad litem appeal. Upon our de novo review, we reverse and remand for further proceedings.

I.      **Background Facts and Proceedings**

V.G. was born in 2020 and diagnosed with cystic fibrosis several weeks later. Cystic fibrosis is caused by a mutation in a gene for the chloride channel. The mutation results in a thick mucus layer on the lungs. The mucus gets stuck in the airways and can cause infections. V.G. suffers from the "double delta" F508 variation which, because of mucus plugs, blocks her pancreas from producing enzymes to absorb the fat in her diet.

Since her diagnosis, V.G. has been treated by pediatric pulmonologist Dr. Alladdin Abosaida—the director of the cystic fibrosis center at Blank Children's Hospital. V.G. has appointments at the center every three months, during which she is seen by a multidisciplinary team that includes a pulmonologist, gastroenterologist, dietician, physical therapist, respiratory therapist, and social

worker. This team developed a care plan for V.G. that was to include the following daily therapies: (1) "[t]wo 30-minute vest treatments per day when well and four 30-minute vest treatments per day when ill" with a properly fitted vest to help loosen and clear the thick mucus that can build up in the lungs;[1] (2) nebulizer treatments with prescribed medications, including a three-percent sodium chloride solution and Pulmozyme, a "mucolytic agent that breaks up and thins mucus"; and (3) pancreatic enzyme supplement capsules to improve the absorption of vital nutrients. The center also requires a chest x-ray every year with annual labs, along with a chest "CT at one year of life and every other after that," and a "Sputum/Throat Culture every 3 months" at clinic visits. And once V.G. turned two years old, the center recommended that she start a medication called Orkambi that results in "less viscous mucus, less infections, less exacerbations."

Despite these clear recommendations, the parents have been difficult to work with during their time at the center according to Dr. Abosaida:

> They don't want to do whatever we recommend, they refuse treatments, they always look for [a] different approach, which I encourage people to look at. If there's anything outside what we recommend, I would like to discuss it and I just—no matter what you do, no matter how you explain it, no matter how much time you spend with them, they don't want to listen to our recommendations.

These difficulties led to a report to the Iowa Department of Health and Human Services in May 2021 that the parents were failing to provide V.G. with adequate medical care. That report, and another that followed in November, were not confirmed. During this time, V.G.'s weight was an issue, dipping to a body mass

---

[1] Dr. Abosaida described the vest as a "shaking machine or oscillator" that dislodges mucus from the airways so the patient can cough it up and keep the airways clear.

index just above the third percentile in October. A letter from the center about V.G.'s condition, which was admitted as an exhibit, explained that the Cystic Fibrosis Foundation recommends that children with the disease "reach a weight for length of the 50th percentile by 2 years of age (after age 2 a [body mass index] of 50% or above)." Dr. Abosaida said that a body mass index "at 50 or above" is the "magic number" for cystic fibrosis patients because "nutrition is ammunition for them. They can fight infection, they can fight the inflammation," and increase their lung function. V.G.'s body mass index has historically been below that threshold, leading to several hospitalizations during her short life.

The parents' displeasure with the center, and Dr. Abosaida in particular, came to a head during a contentious three-month checkup in March 2022. At that checkup, the parents refused to engage with the providers who were there to see V.G. Dr. Abosaida was able to examine V.G., during which he noted some abnormal lung sounds. He recommended a chest x-ray, both "as part of [her] annual checkup and also to evaluate her lungs due to" the abnormal findings. Dr. Abosaida also told the parents that the center's pediatric gastroenterologist was there to see V.G. "and to go over her weight gain issues and C. difficile infection," which had been recurrent since a hospitalization in October 2021 for failure to thrive and "MRSA pneumonia." The parents left before meeting with the gastroenterologist and refused the chest x-ray because V.G. had one in October. Given V.G.'s condition, and the center's discovery that her parents had not refilled her Pulmozyme prescription since October, a social worker at the center made a report to the department for denial of critical care. The department conducted a family assessment, which did not result in any recommendations for services.

In May, the family began emailing the center to schedule V.G.'s three-month checkup. But because they had not completed the required chest x-ray, the center would not schedule the appointment. The parents accordingly sought care from Callie Williams, a nurse practitioner with a doctorate in pediatric nursing practice. Though she had impressive credentials, Williams had never treated a cystic fibrosis patient before and was unfamiliar with many of the recommended treatments. She said the purpose of the parents' appointment with her in July was to obtain a throat swab for V.G. The swab was positive for pseudomonas, a bacterium in the lungs that "can accelerate the progression in cystic fibrosis and cause lung damage." According to Dr. Abosaida, "when kids at this age—typically when they do treatments and keep their airway clearance, you have less chance of getting [p]seudomonas. But if you don't do treatments and a lot of thick mucus in the airways, then you have a higher chance of acquiring [p]seudomonas."

Williams contacted Dr. Abosaida with the results, and he recommended that the parents take V.G. to the emergency room for possible admission into the hospital. The parents did that, but the emergency room physician noted that while V.G. had a cough, she was not having trouble breathing, her vitals were stable, and a chest x-ray was reassuring. So, after consultation with the center, the emergency room physician decided against hospital admission in favor of treating V.G. with oral antibiotics. According to his notes, the parents were "upset and shared that they feel like the pulmonology clinic wants [their] daughter to die and they are abusing her."

After the July emergency room visit, the center tried to schedule a follow-up appointment with V.G., which the parents refused. Instead, they obtained a referral

from V.G.'s primary care provider, advanced registered nurse practitioner Sarah Lee, to the cystic fibrosis center at the University of Iowa Hospitals and Clinics—the only other such center in Iowa. In an undated letter, Lee noted that while the parents "have always been receptive to my advice," she has "advised them to continue to take her to the Cystic Fibrosis clinics for follow up to prevent severe disease and extend [V.G.'s] life."

The child was seen at the University of Iowa in August. An email from Dr. Rebecca Weiner, the pediatric pulmonologist at the university, to the center's manager at Blank described her appointment with V.G.'s mother as "pretty malignant":

> She felt they were being targeted to find anything wrong. . . . The first sentence out of her mouth was "we wanted to see if we wouldn't be abused here like we were at Blank." She said that you guys refused to "give her a visit" and refused to "give her a culture and such." Dad was mainly quiet in the corner. It was a hard visit, it was very hard to have a useful conversation with her as she was playing the blame game.

Dr. Weiner outlined a few important points about her visit with the family, including that the "therapies Blank has recommended are standard and the same I would advise." She also expressed concerned with V.G.'s weight, noting her "[g]rowth is horrible." Dr. Weiner recommended switching to "weight based enzymes," stating the parents were "wildly underdosing by trying to estimate grams of fat."[2] A similar recommendation had been made by the pediatric gastroenterologist at Blank.

---

[2] Dr. Abosaida explained the difference between the two methods:
> [I]f it's based on weight, you calculate the dose and you tell them, for example, you take three pills before each meal and you take two pills

Less than a week after their appointment at the University of Iowa, the parents brought V.G. to the emergency room at Blank with a worsening cough and weight loss. The child was admitted for cystic fibrosis exacerbation. On admission, her pediatric gastroenterologist noted "that her weight had dropped over the last months and . . . was very below the growth chart with a weight for length at the 2%." He emphasized that the parents should be dosing her enzymes by weight rather than the fat content of her meals, but they again refused.

In the medical notes that followed V.G.'s admission, multiple providers at the hospital documented the parents' hostile response toward their treatment recommendations. One example, among many, was a note from a nurse about a week into the child's hospitalization:

> [The mother] stated that she will no longer allow nurses or respiratory therapist in the room to do treatments other than IV antibiotics. Mom states that she will no longer push her call light to allow staff to observe her giving the enzymes and that she will do it on her own because we are lying about doses given. She also stated that she will be giving her own respiratory treatments and that she will no longer use their vest and will do pulm cup treatments instead.

Because the parents refused to implement the recommended treatment for V.G., another report was made to the department before she was discharged from the hospital. When the investigator consulted Dr. Abosaida, he worried about whether the child "would receive adequate treatment upon discharge, based on

---

before snacks. But you cannot exceed, for example, 20 pills a day. So you have limits, you have a plan, easy.

And then the fat content, you have to see what's in the meal, how much fat in the meal, you have to measure it, you have to be really close to accurate. And then based on that you calculate the amount of enzymes they need.

According to Dr. Abosaida, the problem with calculating by fat content for children is that children often don't finish their meals, resulting in a skewed enzyme dosage.

history and the parents continuing to argue with providers while inpatient at the hospital." Dr. Abosaida told the investigator that V.G. would "not die immediately if she does not receive therapies as prescribed, but she could survive for another 6 months to 3 years, dying a slow death. . . . [S]he will lose weight, have bacteria further colonize in her lungs, and have slow respiratory failure over time."

The report was founded and, at the end of August, V.G. was removed from her parents' custody and the subject of a petition to adjudicate her as a child in need of assistance under Iowa Code section 232.96A(5). She was placed with a relative, where the parents were able to see her every day and participate in her medical care. By November, V.G.'s body mass index was almost at the fifty-percent mark. But the parents still deviated from some of the therapies. A medical record from that month noted the mother commented that "[s]ometimes [V.G.] does not want to do [the] vest as she would rather be playing with others, so on those occasions they will do hand clapping." And the parents kept dosing the child's enzymes by the fat content of her meals instead of her weight.

In February 2023, after a series of hearings on the child's removal and adjudication, the juvenile court returned V.G. to her parents' custody, finding she would not "be placed in imminent harm, provided that we have some services in place to ensure that she continues to have the care that she's been provided since she was removed." A few weeks later, the court dismissed the State's adjudication petition, ruling:

> Since the temporary removal, the parents have continued to provide care for the child, including her nebulizer treatments, medication management, medical appointments and providing enzymes. The parents have a fundamental right to care for their child. While questioning the cystic fibrosis medical staff's

recommendations, they were not "unwilling or unable to provide such treatment." They continued to try to schedule appointments for the child after receiving no response or having appointments canceled by the Blank clinic. Admittedly, there was a significant breakdown of the parents and medical staff relationship. Dr. Abosaida did not believe the parents were doing enough in their care of the child, and the parents did not believe Dr. Abosaida and the Blank clinic were doing enough in its care of the child. The parents chose to seek additional treatments and alternative options, some of which were recommended by the Cystic Fibrosis Foundation, that Dr. Abosaida so heavily relied upon. They also sought holistic remedies to ease the child's symptoms and reported observing the benefits therefrom. The child's response to COVID, which was not known to Dr. Abosaida at the time, more than likely attributed to the child's loss of weight and some deterioration of her condition.[3]

. . . . The parents have remained cooperative and have followed the recommendations of the Department. . . . The parents have not changed the manner of care for the child since the child was removed from their home. The child has gained weight and is doing well. The parents have demonstrated a willingness and ability to ensure the child is getting care to address her incurable disease.

Both the State and the guardian ad litem appeal from this ruling, which was stayed by order of our supreme court on the State's emergency motion.[4]

## II.      Standard of Review

We review child-in-need-of-assistance proceedings de novo. *In re J.S.*, 846 N.W.2d 36, 40 (Iowa 2014). Though we give weight to the fact findings of the juvenile court, we are not bound by them. *Id.* Thus, "our review is not a rubber stamp of what has come before." *In re J.W.*, No. 14-0515, 2014 WL 3749419, at *1

---

[3] As the State points out, medical records from Blank and the University of Iowa noted the child tested positive for COVID-19 at the end of July. None of the providers linked that positive test to her condition in August when she was hospitalized. In fact, the parents told the emergency room physician who saw V.G. before her admission that she had recovered from COVID-19.

[4] The supreme court's order allowed the child to remain in her parents' custody under the protective supervision of the department during the appeal.

(Iowa Ct. App. July 30, 2014). The most important consideration is the best interests of the child. *See J.S.*, 846 N.W.2d at 40.

## III. Analysis

We start our analysis by recognizing that "[n]ormally, there is no justification for the State's interference in the private relations of a family or for the State's examination of the judgment of parents in making decisions concerning the well being of their children." *In re K.M.*, 653 N.W.2d 602, 607 (Iowa 2002) (citing *Troxel v. Granville*, 530 U.S. 57, 68–69 (2000)). "[P]arents' constitutionally protected authority over their children includes the right to make decisions regarding health care." Maxine Eichner, 50 U.C. Davis L. Rev. 205, 242 (2016) (citing *Parham v. J.R.*, 442 U.S. 584, 602 (1977)). Yet this authority is not absolute. *See K.M.*, 653 N.W.2d at 608. "[W]hen parents abdicate their responsibility to properly care for their children," the State must "intercede and provide the necessary care." *Id.* But at what point does the State's duty to ensure "that every child within its borders receives proper care and treatment," trump the right of the child's parents to make medical decisions for their child? *In re A.M.*, 856 N.W.2d 365, 376 (Iowa 2014) (citation omitted).

Under Iowa Code section 232.96A(5), our legislature has determined that point is reached when a "child is in need of medical treatment to cure, alleviate, or prevent serious physical injury or illness and whose parent, guardian, or custodian is unwilling or unable to provide such treatment." The State has the burden to prove this ground for adjudication by clear and convincing evidence. *See* Iowa Code § 232.96(2).

On appeal, the State claims that it met its burden because the evidence showed V.G. is "clearly in need of a number of specific, consistent, daily medical treatments to address her cystic fibrosis and her parents had been unwilling or unable to provide the necessary treatment until" the department and the juvenile court became involved. The guardian ad litem echoes this claim, pointing out: "The main issue of this case is whether or not the parents were unwilling to provide [the] necessary care and treatment."

The parents focus on that issue as well, arguing that they *did* provide their child with medical treatment. The problem, however, is that the treatment they provided was not what the pediatric cystic fibrosis specialists agreed was required to prolong V.G.'s life. *Cf. In re M.R.R.*, No. 10-1996, 2011 WL 4378037, at *6 (Iowa Ct. App. Sept. 21, 2011) ("Making a decision to give one's child medication and/or treatment may find the parents faced with weighing the differing opinions of medical experts."); *In re D.J.*, No. 06-0625, 2006 WL 1751269, at *4 (Iowa Ct. App. June 28, 2006) (reversing juvenile court order that authorized eye surgery for a child over his mother's objection because of the "physicians' uncertainty and their unwillingness to offer an opinion without further examination"). Those specialists— at the only two cystic fibrosis clinics in Iowa—recommended the same standard treatments for the child: (1) vest treatments with a properly fitted vest; (2) nebulizer treatments with a three-percent sodium chloride solution and Pulmozyme; (3) pancreatic enzyme supplement capsules dosed by weight; (4) starting the Orkambi medication at age two; and (5) annual chest x-rays. The parents resisted each of these, in part because of perceived side effects from the treatments and V.G.'s reaction to them.

The effectiveness, invasiveness, and risks of proposed interventions should be considered, along with the seriousness of a child's medical condition, in "balancing the parents' fundamental interest in directing the upbringing of the child with the state's interests." *In re I.S.*, 199 N.E.3d 1130, 1150 (Ohio Ct. App. 2022); *see also M.R.R.*, 2011 WL 4378037, at *6 n.16 (comparing the decision whether to vaccinate a child for certain illnesses with decisions involving a "child who may die of a disease for which there is a treatment"). "The more effective the intervention, the heavier the weight that will be placed on the state's side of the scale; the more invasive the procedure and the more risks posed by the intervention, the lighter the weight placed on the state's side of the scale." *I.S.*, 199 N.E.3d at 1154. "The linchpin in all cases discussing the 'best interests of a child,' when a parent refuses to authorize medical care, is an evaluation of the risk of the procedure compared to its potential success." *Newmark v. Williams/DCPS*, 588 A.2d 1108, 1117 (Del. 1991). Here, the evidence showed the risks of the recommended treatments were minimal compared to their benefits. *See id.* at 1120 ("Courts have consistently authorized state intervention when parents object to only minimally intrusive treatment which poses little or no risk to a child's health.").

First, against Dr. Abosaida's recommendation, the parents obtained a vest that was too big for V.G. Because of its large size, the vest's oscillating pods landed on V.G.'s abdomen rather than her lung fields, meaning it was not effective in dislodging the mucus in her airways. The parents also admitted they were not administering the prescribed amount of vest treatments at home, which was apparent from her stay at the hospital in August when she was "crying and

screaming every time they put the vest on her." They preferred to use alternate airway clearance methods authorized by the Cystic Fibrosis Foundation, like hand clapping. The mother points to a snippet from the foundation's website, admitted as an exhibit at the hearings, that states no form of airway clearance techniques "was shown to be superior to another form." But she ignores the part that says the choice of technique should "be individualized to the patient, as patient-specific factors may make one form . . . superior to another for the individual patient." The individualized form prescribed for V.G. was a "properly fitting vest."

Second, the parents were not consistently using the three-percent sodium chloride solution and Pulmozyme medications that were to be administered through V.G.'s nebulizer. In place of the sodium chloride, the parents were taking V.G. to a salt lounge.[5] While Dr. Abosaida was ambivalent about that therapy, he testified "it cannot replace the medical treatments." He was also adamant about the need for Pulmozyme, the "only FDA approved mucolytic agent that breaks up and thins mucus," as was Dr. Weiner at the University of Iowa. The parents did not want to use that medication because they said it caused lung bleeds. There was no evidence in V.G.'s medical records, however, that she ever suffered from any lung bleeds. And Dr. Abosaida testified he had "never seen Pulmozyme cause bleeding directly to someone at her age or even older." Neither Dr. Abosaida nor Dr. Weiner would prescribe Mucomyst, an alternate medication the parents wanted

---

[5] At some points in the record, the parents claimed the three-percent sodium chloride solution was out of stock. But they had been given instructions on how to dilute a higher concentration that was available.

to use, because data showed that "it does not work" and carries a risk of bronchospasms.

Third, the parents refused to dose V.G.'s required pancreatic enzyme supplements by her weight rather than the fat content of her meals. Dr. Abosaida testified that while parents can choose between the two approaches, both of which were acceptable by the standards of the Cystic Fibrosis Foundation, "we want results, we want to see [body mass index] head in the 50th percentile. And if you don't, we need to change strategies." When V.G.'s body mass index dropped to three percent, Dr. Abosaida said that was because "she had mal-absorption, she needed enzymes, she needed the proper dose of enzymes that can help her absorb the food that she eats." He accordingly recommended weight-based dosing, as did the pediatric gastroenterologist and Dr. Weiner, who believed the parents were "wildly underdosing [V.G.] by trying to estimate grams of fat." Yet, even after V.G.'s hospitalization, the parents insisted on dosing her enzymes by the fat content in her meals. *See In re J.A.*, No. 21-1853, 2022 WL 468715, at *5 (Iowa Ct. App. Feb. 16, 2022) (affirming adjudication under renumbered section 232.96A(5) where it was undisputed the child "needs prescribed medicine for his life-threatening asthma" but the parents unilaterally reduced his dosage).

Fourth, the parents refused to start V.G. on Orkambi, which Dr. Abosaida described as "one of the best things that happened in cystic fibrosis in the last five years." The mother objected to it because she thought it had high levels of fluoride that could cause "brain problems." However, Dr. Weiner told the parents that Orkambi was not associated with any neurologic side effects. The treatment the parents wanted instead, a technology called "CRISPR/Cas9," was "still at the

bench research [stage], not even at clinic trial." Dr. Abosaida said the research is ongoing and "might take 20, 30, 40, 50 years, who knows." With a progressive disease like cystic fibrosis, Dr. Abosaida testified "every minute counts." *See In re L.T.*, 494 N.W.2d 450, 453 (Iowa 1992) (affirming adjudication where a child's mother refused "to consider the treatment service which [the child] now requires above all else").

Fifth, the parents pushed back on obtaining chest x-rays for V.G. Dr. Abosaida said annual x-rays were "very important" for the child's care because they help monitor progression of the disease and the presence of mucus plugs. An x-ray from months earlier would not show "how bad is her disease right now," According to Dr. Abosaida. They also refused Dr. Weiner's request for an x-ray in August, just before V.G.'s hospitalization, after she noted abnormalities in the child's examination. Like Dr. Abosaida, Dr. Weiner said that made it "difficult for [her] to treat [V.G.] adequately." *See id.* (affirming adjudication where a child's mother refused "to cooperate in extending to [the child] the care she needs"). During the juvenile court proceedings, the parents expressed concern about the amount of radiation the child had been exposed to in her young life. But when asked about that concern, Dr. Abosaida explained the benefits of x-rays for children with cystic fibrosis outweighed their risk, noting that the radiation in chest x-rays "is very, very low."

The parties agree that the child's disease is a serious medical condition that will progressively worsen as she ages. *Cf. M.R.R.*, 2011 WL 4378037, at *6 (finding there was not "clear and convincing evidence to support the juvenile court's findings that the child was in need of medication to alleviate death or other

serious consequences"). Dr. Abosaida testified that people with cystic fibrosis used to die in their twenties and thirties. But now, "with all these therapies we have, the life expectancy . . . is 53 years old." The therapies, however, have "to be executed as is. You cannot alter it, there's no way." When V.G. was hospitalized in August, Dr. Abosaida testified that V.G. was not on track for that extended life expectancy because she was not getting the proper treatments at home. He explained: "You have to do everything you have, you have to use all the tools available to . . . slow the progression. And if you don't do that, then people don't do well with [cystic fibrosis]." Dr. Weiner said the same, telling the parents "that adequate nutrition, and adequate treatment of pulmonary ailments (such as exacerbations, pseudomonas infection, etc.) will affect her overall health and how long [V.G.] lives. Adequate care and standard of care treatments will prolong her life."

On this record, we find clear and convincing evidence that the parents were "unwilling or unable to provide" the recommended treatment for V.G.'s disease and the court's aid is required to make sure that treatment is administered. *See* Iowa Code §§ 232.96(9), .96A(5). In reaching this conclusion, we do not doubt the parents' love or concern for V.G. As the State said in the closing paragraph of its petition on appeal:

> We are not here to pass judgment on V.G.'s parents. We are here to ensure she is provided proper medical care going forward, so she can grow and thrive as best as possible given her cystic fibrosis diagnosis. The best way to achieve that end is to adjudicate her a child in need of assistance and thereby continue [the department] and juvenile court oversite of her vulnerable condition.

For these reasons, we reverse the juvenile court's ruling dismissing the State's petition to adjudicate V.G. a child in need of assistance under section 232.96A(5) and remand for adjudication and further proceedings.

**REVERSED AND REMANDED.**